JOSEPH A. GARAVENTA, APPELLANT, v. ELEANOR GARDELLA, AS ADMINISTRATRIX OF THE ESTATES OF KATHERINE GARAVENTA, DECEASED, AND JOHN GARAVENTA, DECEASED, RESPONDENT.

Nos. 3438, 3439

June 3, 1946. 169 P. 2d 540.

*Springmeyer & Thompson,* of Reno, for Appellant.

*H. R. Cooke* and *John Davidson,* both of Reno, for Respondent.

## OPINION

By the Court, TABER, C. J.:

For some years prior to 1919 John Garaventa and his wife Katherine were the owners of certain ranching properties in Washoe and Lyon Counties. In the latter part of 1918 and the early part of 1919 the Garaventa Land & Livestock Company was organized. John and Katherine conveyed said properties, including livestock, to the corporation, which had an authorized capital stock of 600 shares, each having a par value of $100.

598 shares were issued to John Garaventa, and one share each to Joseph and Frank, two of the children of John and Katherine. The father and said two sons were elected as directors and officers of the corporation. In September 1927, one share of the father's stock was canceled, and a certificate therefor made out in the name of another son, William.

The father and mother died intestate in 1933, John on February 23, Katherine on March 2. They left as their heirs at law three sons, the said Joseph, Frank, and William, three daughters, Eleanor, Angelina, and Albina, and one grandchild, Evelyn, daughter of a deceased son John. The daughters and granddaughter are married. In the summer of 1941 one of the daughters, Eleanor (Garaventa) Gardella, was appointed and qualified as administratrix of the estate of her father, and in February 1942, letters of administration were issued to her in the estate of her mother.

In March 1942 plaintiff commenced two actions against Joseph, one as administratrix of the estate of her mother and the other as administratrix of the estate of her father. These cases were Nos. 70,116 and 70,117, respectively, in the Second judicial district court, Washoe County. In her amended complaints she alleges that shortly after the death of father John, Joseph took physical possession of the certificates representing 597 shares of said stock, with the knowledge and consent of all the legal heirs, and kept and held them as trustee for their use and benefit until July 1941, when he repudiated his trust and thenceforth wrongfully claimed and asserted that he was the sole and exclusive owner of all said stock. In the prayers of said complaints plaintiff asked that Joseph be ordered to deliver all of the 597 shares of stock to plaintiff as administratrix. In his answers Joseph denies the trust, and by way of affirmative defense alleges that since 1932 he has been in the exclusive possession of all the issued and outstanding capital stock, and during all that time has openly, notoriously, and continuously claimed to be the owner

of all said stock under a claim of right and title thereto.

Before said actions were tried, another suit was brought in said district court by said Eleanor Gardella, as administratrix of the estates of her father and mother, and Frank and William Garaventa, plaintiffs' against said Joseph Garaventa, Louise Garaventa, Edward Garaventa, Garaventa Land & Livestock Company and the First National Bank of Nevada, defendants. The number of this action was 71,626, and it was tried before Honorable A. J. Maestretti. Plaintiffs sought an injunction and asked for the appointment of a receiver, alleging mismanagement on the part of Joseph. In addition to a large amount of testimony and documentary evidence bearing on the question of alleged mismanagement on the part of defendant Joseph Garaventa, there was also a considerable amount of evidence admitted regarding the ownership of the 600 shares of capital stock. In rendering its decision, however, the court in that case did not decide who owned the stock or any part of it. After the decision in the last mentioned case the other two cases, Nos. 70,116 and 70,117, were tried together without a jury before a visiting judge, Honorable Thomas J. D. Salter, at that time judge of the Sixth judicial district court, Humboldt County. On the consolidated trial of these two cases it was stipulated in each of them that the testimony taken by the respective parties on the trial of said case No. 71,626 "may all or any portions thereof be used by either of the parties hereto upon the trial of the above-entitled case with the same force and effect as if the witnesses were personally present and testifying, subject, however, to objections made as shown by said transcript." It was also stipulated that all exhibits in case No. 71,626 should be transferred and deemed filed in cases 70,116 and 70,117, and that said exhibits, together with the transcript of testimony in said action 71,626, should constitute the evidence or offered evidence, as the case might be, in said consolidated causes.

After due proceedings the court, in case No. 70,116, entered judgment in favor of plaintiff and against defendant, in part, as follows:

"(a) Said plaintiff, as administratrix of the Estate of Katherine Garaventa, deceased, is adjudged and decreed to be the owner of an undivided one-half interest in 597 shares of the capital stock of Garaventa Land and Livestock Company * * *.

"(b) That said plaintiff, as such administratrix, be and she hereby is decreed to be entitled to the immediate possession of said undivided one-half part, share and interest in said 597 shares;

"(c) That at no time since January 2, 1919, has said defendant been the owner of any shares of the capital stock of the said Garaventa Land & Live Stock Company, except one share thereof, represented by Certificate No. 11, issued on said January 2, 1919, in the name of said defendant."

A similar judgment was entered in case No. 70,117. Motions for new trials were denied, and defendant has appealed to this court from said judgment and from the orders denying his motions for new trials.

One of appellant's contentions is that the trial court's decisions, findings, and judgments are not supported by, and are contrary to, the evidence. In the consideration of this assignment the court is confronted with an important preliminary question arising out of the fact that the evidence in the two consolidated cases tried before Judge Salter consists entirely of the transcript of testimony taken orally in the case tried before Judge Maestretti, and the documentary exhibits in that case. Appellant maintains that as the trial judge had no opportunity of observing the witnesses while testifying, and their demeanor on the witness stand, this court is as capable of examining the evidence and drawing conclusions from it as was the court below, and that for this reason we should reexamine the entire case, determine for ourselves the weight of the evidence and credibility

of the witnesses, and draw our own conclusions. Respondent's position on this question is that under the constitution and statutes of Nevada this court has no power, in the exercise of its appellate jurisdiction, to try an appealed case on the facts de novo; that where, as here, there is a substantial conflict of evidence, the action of the trial court in determining the credibility of witnesses is not to be disturbed on appeal if that court's findings have any substantial support in the evidence.

■ The findings of fact of a trial court, where there is substantial evidence to support them and the evidence is conflicting, will not as a general rule be set aside by an appellate court. There are two reasons for this rule. One is the fact that the position of the trial court for the purpose of determining factual questions is superior to that of the appellate court in that the former usually has the opportunity to observe and hear the witnesses and parties and obtain the benefit of many points and matters that cannot be brought before the appellate court for its consideration by way of printed record. 5 C. J. S., Appeal and Error, sec. 1656, p. 682, note 63. The other reason is based upon the fundamental and essential distinction between the respective provinces of trial and appellate courts. Tupman v. Haberkern, 208 Cal. 256, 280 P. 970; 5 C. J. S., Appeal and Error, sec. 1656, pp. 681, 682, note 62. Under the provisions of the constitution of Nevada (art. VI, sec. 4) this court is not given original jurisdiction in cases like the present. The question thus arises whether, where this court is in just as good a position to weigh the evidence and draw its own conclusions therefrom as was the trial court, we would be exercising original, not appellate, jurisdiction should we undertake to reexamine the entire case, determine for ourselves the weight of evidence and credibility of the witnesses, and draw our own conclusions as to whether the evidence preponderates in favor of the plaintiff.

Appellant does not contend that this court should exercise original jurisdiction in the present case, or that

it should try the case de novo. He does contend, however, that the ordinary rule of appellate decision with regard to the weight to be given the findings of the trial court does not apply in this case. "This contention," appellant argues, "has nothing whatsoever to do with the kind of jurisdiction the supreme court is given by the constitution. It pertains merely to a rule of appellate decision within the jurisdiction of the court." But no authorities are cited in support of this position. Every case cited by appellant bases its ruling upon the one consideration that the appellate court in cases like this is in just as good a position to weigh the evidence and draw its own conclusions therefrom as was the trial court.

The authorities are divided. Appellant is for the most part right in stating that the decisions of the federal courts sustain his position. 36 C. J. S., Federal Courts, sec. 297, p. 415, notes 24, 25. But they are not unanimous. Bell v. Saxon, 5 Cir., 296 F. 690. In Photoplay Pub. Co. v. LaVerne Pub. Co., 3 Cir., 269 F. 730, cited by appellant the evidence was uncontradicted. The court said, 269 F. at page 732: "When, however, as in the case at bar, the testimony, which was taken by deposition here and there in many parts of the country, *is uncontradicted,* and the witnesses were never before the trial judge, the rule and reason therefor disappear." (Italics ours.) In addition to federal decisions, appellant also cites two Idaho cases, and our own research indicates that a considerable number of other jurisdictions, including Colorado, New Mexico and Kansas, also support or tend to support his contention. He urges, too, that the Nevada case of Mortimer v. Pacific States Savings & Loan Co., 62 Nev. 142, 147, 145 P. 2d 733, sustains his position.

On the other hand California, Montana, Minnesota, Wisconsin, Arkansas, Missouri, Texas and about ten other jurisdictions uphold the rule contended for by respondent.

After careful consideration of sec. 4 of art. VI of

our state constitution and the conflicting decisions of the courts, we do not feel that this court can ignore the jurisdictional question. In our opinion the correct rule is that even where the evidence was all in writing, the trial court's findings will not be set aside unless clearly or manifestly against the weight of the evidence, or without any reasonable support therein. Of the numerous authorities sustaining this rule, we cite but a few which give the reasons for their holdings. Reay v. Butler, 95 Cal. 206, 30 P. 208; Tupman v. Haberkern, 208 Cal. 256, 280 P. 970; 2 Cal. Jur. 931–932, note 18; Hill v. Stealey, Mo. App., 153 S. W. 2d 813; Sommers v. City of St. Paul, 183 Minn. 545, 237 N. W. 427; Stephens v. Summerfield, 22 Tex. Civ. App. 182, 54 S. W. 1088; Visanska v. Workingmen's Bldg. & Loan Ass'n. of Columbia, 41 S. C. 546, 19 S. E. 202. See also In re Walden's Estate, 166 Cal. 446, 137 P. 35; and Klein v. Valerius, 87 Wis. 54, 57 N. W. 1112, 22 L. R. A. 609. In State v. Johnson, 100 Utah 316, 114 P. 2d 1034, there is an extended and informative discussion showing the distinction between original and appellate jurisdiction. That case lends support to the rule adopted here.

In the Mortimer case, 62 Nev. 147, 145 P. 2d 733, 739, appellant's testimony was "not contradicted in any respect," and this is specially pointed out in the main opinion. In the instant case the testimony is in very sharp conflict with respect to most of the important issues. In Cassinelli v. Humphrey Supply Co., 43 Nev. 208, 183 P. 523, this court said that a finding based upon undisputed facts is not binding upon appeal. And see San Diego Trust & Savings Bank v. San Diego County, 16 Cal. 2d 142, 105 P. 2d 94, 133 A. L. R. 416; 5 C. J. S., Appeal and Error, sec. 1656, p. 698, note 27; 3 Am. Jur. 471, note 20. In the Mortimer case this court, in the exercise of its appellate jurisdiction, decided that the trial court had abused its discretion in allowing the receiver's attorney only $3,000 for his services performed in the year 1941. It was only after first reaching

that conclusion that the court went on to reverse the order and direct the district court to enter an order allowing appellant $3,000 additional compensation for the services performed by him in that year. That this court, before so modifying the order for 1941 compensation, had reached the conclusion that the trial court abused its discretion, satisfactorily appears from the following language appearing earlier in the main opinion: "One consideration, we think, which contributed to the cause of the trial court's failure to exercise a proper discretion in the premises * * *." The question we have been discussing here was not presented to this court in the Mortimer case, either in the briefs or in the oral arguments. However, it is clear that the court was aware of and in accord with the rule that it will not exercise original jurisdiction except when so authorized by the constitution. This appears from the fact that the court declined to make a certain order because to do so "would be exercising original rather than appellate jurisdiction."

■ The conclusion we have reached in the foregoing discussion is based squarely upon the ground that in cases like the present this court has no power or jurisdiction to weigh the evidence without regard to the findings of the trial court, but can only consider the evidence for the purpose of determining whether there was any substantial evidence to support such findings, and whether the conclusions reached by the lower court were clearly wrong. This the court has done, and there follows a brief summation of the more important parts of the testimony tending to support the contentions of the respective parties.

Frank Garaventa testified that shortly after the death of his father he and Joe went to the bank where their father's safety deposit box was, and that they were allowed to open the box after Joe had signed his father's name; that they removed the 597 shares of capital stock—the certificates being endorsed in blank; that

they took the stock to attorney Kearney's office where it was to remain until the properties could be built up "to the extent that we could pay the girls their prorated amount of stock that was coming to them," and the three brothers would then have the property to themselves; that after the incorporation the father said that he had placed the stock in the safety deposit box with the understanding that each of the boys was to get 150 shares and each of the girls 50 shares.

Plaintiff (respondent) testified that a few days after her father died, she sent her brother William out to the ranch to get the key to the safety deposit box out of her father's pants pocket; that after getting it, William gave it to Joe; that on one occasion Joe told her that the father had turned everything over to him when he (Joe) was 14 years old, and that he had a paper to show this, but that Mr. Kearney didn't want him to produce it until the right time; that shortly before her father's death, when her husband and mother were also present, her father said that he had left the papers in the bank box, that each of the girls would have 150 shares, the niece ten shares, and the balance to go to the three boys; that during this conversation Joe Garaventa and his wife were not present, but were in the kitchen; that her father at different times stated what disposition he was going to make of the stock; that on one occasion he said he wished that he could make a sale of one of the ranches so that he could give the girls $5,000 apiece; on another occasion he said that 50 shares were coming to each of the girls and 150 apiece to the boys; that Frank always handled the business end of the company, and the father kind of looked up to him; that Frank was on the ranch continuously until after the father's death; that he did ranch work like all the rest, besides letter writing and taking care of the business part; that Bill also did ranch work like the others, and the same was true as to Joe.

William Garaventa testified that he got the key out

of a purse in his father's overalls and gave the key to Joe; that Joe said he wanted to get the shares out of the safety deposit box and put them in Mr. Kearney's office and they could be divided later; that Joe said he signed dad's name, got into the box at the bank and took the shares of stock to Mr. Kearney's office; that Joe said he didn't like to sign his father's name and get the stock that way, but thought it would save expense as the company was pretty heavily mortgaged, and that the shares might be divided amongst the heirs without going through court; that Joe said Frank was with him when he got the stock out of the safety deposit box and that the stock was then taken to Mr. Kearney's office; that from 1927 on, witness was told by his father and brothers that he had the same share as the other boys; that he worked for a Mr. Cowles a little more than two months in 1931 and about three months in 1932, but the rest of the time was working on the Garaventa ranches; that about the fall of 1918 his father and mother discussed with him the matter of incorporating the ranches, the reason for this step being, according to the father, that the latter was having trouble with Joe, who at different times wanted his father to sign the Wadsworth ranch over to him; that the father said he felt that he wanted to leave the property to all of the children equally, and that therefore he was going to incorporate—that they were all his boys and he was going to incorporate the property and leave it to them all the same; that the father sometimes said that he was not satisfied with some of the things Frank was doing, but that he never said that Frank would not have any share in the company stock; that whenever the matter of the stock was discussed the father always said that the boys were to be left equal; that he always said this up to the time of his death.

David Gardella, husband of respondent, testified that when his father-in-law learned in 1931 that witness' property in Reno was mortgaged for more than $4,000

he said, "If everything go right I want to sell that ranch, Fort Churchill, I give you the money to pay your mortgage. I leave enough to your wife to pay the mortgage on this property"; that his father-in-law told him a couple of times that Joe wanted to get the property all by himself, but that he (the father-in-law) said, "all my kid, I want to treat everybody the same"; that his father-in-law told him these things about three years before his death, at the Wadsworth ranch; that his father-in-law said, "I want to treat all the same way, I want to leave money to all of them, all my kids"; that witness received no pay for his work, and his father-in-law said, "You get your pay; you get your pay in shares"; that it was between the fall of 1932 and February 1933 that witness had the talk with his father-in-law about the Quincy street property in Reno; that it was after the banks closed and times were pretty hard; that he had this nice piece of property in Reno, but told his father-in-law that there was quite a mortgage on it; that his father-in-law then said, "Want to know how much the mortgage is you got; if I can sell the ranch, all right, if I dont, I leave enough in shares"; that it was the Towle ranch (Fort Churchill) that his father-in-law was talking about; that witness was at his home on the evening of February 23, 1933, when John Garaventa, his wife's father, was brought in from the ranch; that after the old gentleman, with witness's help, undressed, and after witness went to bed, "my wife come over, he told her to go get the key out of his pants, somebody to get the key, he got some stock in the bank, he want to take it out, some shares of some kind"; that his father-in-law had only one key; that William Garaventa went down, got the key, and gave it to Joe.

Joe Garaventa testified that he was fifty years of age; that he has lived on the Wadsworth ranch and worked on that and the other Garaventa ranches all his life since he was about sixteen years old, and also before that during school vacations, and chore work after

school; that he first got possession of 250 shares of the capital stock in January 1919 in Mr. Kearney's office; that he got a further 100 shares in 1927 and the remainder of the stock in 1932; that on these occasions his father was with him in the office of Mr. Kearney, who was also present; that the stock is all in the same condition now as it was during the period he had it in his possession; that at each of said three times when he received a part of the stock he took it home, where he kept it in his desk to which he had access; that no one else had access to this desk; that he never kept any of the stock certificates in a safe deposit box in the Reno National Bank; that so far as he knows none of them was ever kept there; that he never went to the main office of the Reno National Bank with his brother Frank and took these stock certificates or any of them from a safety deposit box there; that he can't remember ever going to the bank with Frank after their father's death; that he never got a key to the father's safety deposit box from William; that he (Joe) had the key; that in 1940 he told William that the latter did not have any interest in the company, and that William then said he was going to kill Joe; that witness told William he was going to sell the ranch because it was getting too hard for him and he couldn't keep up with it; that William said he would like to buy the Newlands ranch himself, and that Joe told him to get the money and he could have it—that witness would make the price as cheap as he possibly could; that William did not at that time assert any interest in the corporation; that in 1939 also he told William that he (William) had no interest in the stock; that Frank never asserted any interest in the corporation; that in the summer of 1942 a trust deed was given to Mr. Kearney for $5,000 by the company though Joe and his new board of directors for money that was owing Mr. Kearney; that the safe and the desk belong to the corporation.

Mrs. Louise Garaventa, Joe's wife, testified that the

desk in the Garaventa house at Wadsworth about which there had been some testimony was not in the house when witness and Joe were married; that they bought it after their marriage, either in 1918 or 1919; that it was paid for by witness with money she made, and she gave it as a Christmas present to her husband; that it has been there ever since, and that hardly anybody except her husband ever used it; that he had the key to the desk; that none of the other Garaventas used the desk so far as she knows, and that her husband used it to keep his personal things in, such as papers; that her husband's parents lived with Joe and Louise at the Wadsworth house from 1913 until '18 or '19; that they then went to the Newlands ranch, and after that to the Towle ranch; that they kept going back and forth between the Wadsworth ranch and the other ranches, but only stayed overnight or a day or two at the Wadsworth ranch and would then return to the Newlands or the Towle ranch and that this continued up to the times of their deaths; that witness did all kinds of work on the ranch, not only for her own family but for William, including washing for him and for the old folks; that she has seen the corporation stock at different times, first in 1919; that her husband had part of the stock at that time and put it in his desk; that she also saw bundles of the stock certificates in 1927 and talked to her husband about it, as she had also done in 1919; that she also saw all the stock again in 1932, and talked over matters concerning it with her husband Joe; that she and her husband never talked to Joe's father about their leaving the ranch; that Joe did all kinds of work on the ranch, getting up at 4:30 in the morning and keeping going until dark; that he couldn't depend upon his brothers or his father.

William M. Kearney, Reno attorney, testified that when the corporation was organized, John Garaventa, the father kept all but 250 shares of the stock—one share was given by him to Frank, one to Bill, and 250 shares to Joe; that after the death of the father, no certificates

of the stock were ever brought to witness's office by Joe and Frank, or by William and Frank; that the stock certificates have not, nor has any of them, been in his office, or in his possession or control, since the death of the father; that witness never told any one to sign the name of John Garaventa upon the records of the Reno National Bank or safe deposit box; that in 1927 Joe was given another 50 or 100 shares of stock by his father; that in 1927 one share in the name of William E. Garaventa was in witness's possession and under his control; that the father later took his share out of witness's possession, along with some other of the stock which had been temporarily in his possession; that witness had taken considerable interest in this case (No. 71,626), and believes that defendants should prevail.

Evelyn Wilson testified that when she saw her grandfather very shortly before his death he was in a state of coma through the whole day and evening before his death; that he couldn't speak coherently, or at all; that she never told respondent that there had been something left her by her grandfather and that she (Evelyn) was going to sue Joe for it; that respondent never told her not to sue—that she (Eleanor) would speak to Joe; that in the early part of 1934 respondent told her that there was a provision made for her (Evelyn) in the estate in cash, and that unless Evelyn opened the estate she was going to lose it; that she was never asked to be made a party plaintiff in this case; that she hadn't spoken to Frank or to respondent for some time; that she and Bill are friendly; that she thinks Angelina is not friendly to her; that her grandfather was not conscious at any time during the day she saw him from the morning until the night he died; that she came up from San Francisco to be a witness, but that nobody requested her to come; that she had taken quite an interest in the suit (No. 71,626).

D. D. Huartson, chief appraiser for California Western States Life Insurance Company which had a mortgage on the Garaventa properties, testified that in the

middle or latter part of 1933 Joe told him, "I own all the stock."

It is clear that there is substantial evidence to support the trial court's findings, and we find it impossible to say that they are so clearly and manifestly incorrect, erroneous and wrong as to justify or require a reversal on the ground of insufficiency of evidence.

Appellant contends that the amended complaints do not state causes of action in favor of plaintiff as administratrix, and that the findings of fact do not support, and are inconsistent with, judgments in her favor as administratrix. He maintains that plaintiff, as administratrix, cannot recover the stock unless there are creditors of the estates whose rights must be protected. He asserts that the record in the two Garaventa estate proceedings shows that no creditors' claims have been filed, and that the time for filing them has expired. It is his position that any cause of action for the alleged repudiation of the trust lies in favor of the other heirs as plaintiffs, not in favor of the administratrix of the estates. Respondent states in his brief that a creditor's claim for over $800 was on file in the John Garaventa estate long before the issues were made up in the present case. Said claim, says respondents, was based on a promissory note signed by John Garaventa. Neither appellant nor respondent cites any place in the record, transcript, or exhibits showing whether there were any creditors of the estates. Appellant has always denied that there was a trust, and so the heirs have never been able to agree on a settlement or upon a satisfactory disposition of the estates among themselves. 33 C. J. S., Executors and Administrators, sec. 5, subsection c, pp. 884, 885. Again, regardless of whether there were debts against the estates, the court had jurisdiction to grant administration. Id., sec. 6, subsection c. p. 887, note 11.

Appellant's contention that plaintiff's causes of action are barred by the statute of limitations is based upon his claim that no trust was created or existed as

found by the trial court. He recognizes that the actions were not barred if the trust existed. The amended complaints alleged, and the lower court has found, that there was a trust and that it was wrongfully repudiated by defendant about July 1941. As this court has declined to set these findings aside, we hold that the causes of action were not barred.

In the trial of these cases the court excluded certain testimony of attorney William M. Kearney. The defendant (appellant) offered to prove by positive testimony of Mr. Kearney that the title of the capital stock had been transferred from father John Garaventa to defendant, and to prove further by conversations between father John and Mr. Kearney, in the presence of other persons, the reason why the title to said stock had been parted with by the father and transferred to his son Joseph. The offer of proof included a conversation on January 2, 1919, in which father John, Joseph, William and Mr. Kearney participated. In this conversation, according to the offer of proof, father John said that inasmuch as Joe had a family and all of them had been working on the ranch, Joe could remain on the home ranch with his family, and the father would give him 250 shares of the stock if he would be satisfied with that arrangement. Joe said he would be, and thereupon the father turned over to him a certificate for 250 shares of the stock. The father said that he and his wife would live on the Newlands ranch, would get more cattle and run them on that ranch. The offer further included an alleged conversation at a meeting of the directors in September 1927 when father John, Joe, Frank, Will, and Mr. Kearney were present. This conversation related in part to certain conduct of Frank which was displeasing to father John and the others, and according to the offer Mr. Kearney's testimony would show that Frank, at this meeting, voluntarily resigned as a director and officer of the company. In the same conversation the father, John, allegedly stated that he had already

talked with Frank and Joe about electing Will as a director in Frank's place. The offer of proof also included testimony that Mr. Kearney would give regarding a meeting held in the early part of 1932, at which there were present father John, Joe, Mr. Kearney, and a Mr. Dalton, representative of the California State Life Insurance Company. At this time it appeared that the insurance company was threatening foreclosure. Thereafter, according to the offer of proof, father John and Joe discussed with Mr. Kearney the demand of the insurance company for its money. Joe said they might as well turn the property over to the mortgagee and he would go out and work to support his family, since they could not borrow any money to pay taxes or run the ranches and had no means of borrowing more money. They also are alleged to have talked about Will having left and gone elsewhere. Father John, according to the offer of proof, said to Joe that if he would stay on the place and try to work it out, he would give Joe the balance of the stock, and in that way Joe could have a home for himself, and the father and mother also could have a home while they lived; thereupon Joe replied that he would stay under those conditions and the father handed him the balance of the stock, saying in substance and effect that now Joe owned it all.

Plaintiff objected to said offer of proof upon the ground that the admission of the offered testimony would violate the provisions of sec. 8972, N. C. L. 1929, which reads in part as follows: "An attorney cannot, without the consent of his client, be examined as to any communication made by the client to him, or his advice given thereon in the course of professional employment." Earlier in the trial, before the offer of proof was made, both parties expressly waived the provisions of sec. 8966, N. C. L. 1929, which provides in part that no person shall be allowed to testify when the other party to the transaction is dead. But later on when plaintiff objected to a question asked Mr. Kearney concerning a conversation

at which he, father John and defendant were present, basing the objection on said section 8972, N. C. L. 1929, the following took place:

"The Court: The objection is sustained. I am not going to recognize your stipulation any more as to a suspension of the dead man's rule, because I do not believe I had a right to do it.

"Mr. Cooke: Of course, I am not making it with reference to that, your Honor. I am making it on the statute. Section 8972, N. C. L. 1929.

"The Court: The objection is sustained."

We think the trial court should have continued to recognize the stipulation of the parties waiving the so-called "dead man" rule. In re Golding's Estate, 58 Nev. 274, 76 P. 2d 1099. From the court's language it is impossible to say upon what ground the objection was sustained, and the same is true regarding the ruling sustaining plaintiff's objection to the offer of proof.

 On this appeal appellant has not, either in his brief or oral argument, relied upon either the "dead man" rule or the statute relating to privileged communications between attorney and client. His contention here is that the offer of proof is legal evidence against appellant's claim advanced on this appeal that the stock was a gift. Respondent contends that the theory of the defense in the trial court was that the stock had been transferred for a valuable consideration, whereas on this appeal appellant has assumed a different position, namely, that the stock was a gift. According to our view of this matter, defendant at the trial was entitled under the pleadings not only to deny the testimony of plaintiff's witnesses tending to establish a trust, but also to offer evidence showing or tending to show that the stock had been transferred to him by his father, either by way of gift or for a valuable consideration. 38 C. J. S., Gifts, sec. 64, pp. 852, 853; notes 49, 50. Or, defendant could show that some of the stock had been transferred to him as a gift and the balance for a

valuable consideration. The important question is whether the title to the stock was transferred to appellant by his father, and in attempting to establish that fact defendant was entitled to offer any competent, relevant and material evidence for the purpose of showing that the transfer was made in fact, whether by way of gift or for a valuable consideration. The trial court having sustained plaintiff's objection to defendant's offer of proof, defendant was placed in a position where he was compelled to rely upon other testimony tending to establish a transfer of the title to the stock either by way of gift or transfer for a valuable consideration. The written decision of the trial court shows that it recognized that the defendant on the trial had attempted to show that the stock had been transferred either for a consideration or by way of gift. "I think," says the court, "the evidence supports the view that there was no such good and sufficient consideration of a sale, and that there is no clear and unmistakable intention of John to make a gift." In presenting his assignment of error based upon alleged insufficiency of the evidence, defendant naturally felt that he was limited to a discussion of the evidence which was admitted at the trial, but that does not prevent his claiming error because of the lower court's having rejected his offer of proof. We are of the opinion that defendant did not change the theory of his defense within the meaning of the general rule that a party on appeal may not change the theory upon which the case was tried below, nor take a position inconsistent with that he maintained in the trial court. On the contrary, the position which defendant has been compelled to take on this appeal, so far as the sufficiency of the evidence is concerned, is the result of the trial court's erroneous ruling in rejecting the proffered testimony of the witness Kearney; and one of appellant's strongest contentions on this appeal is that because of that ruling he has been prejudiced in his right to show or attempt to show that the stock was in fact transferred to appellant by his father, and the reasons for such transfer.

Any apparent inconsistency in appellant's position on the trial with that assumed by him on this appeal is due entirely and directly to the ruling of the lower court rejecting his offer of proof. Respondent had her day in court with respect to both issues—gift, and transfer for valuable consideration—and defendant's position on this appeal is not unfair, either to the trial court or to respondent.

Nothing in this opinion is to be understood as expressing or indicating the opinion of this court regarding the credibility of any witness, or as to how these cases should be decided on the merits.

The judgments and orders appealed from are reversed, and the causes remanded for a new trial.