LEONE C. FINNELL, APPELLANT, *v.* LEO EDWIN BROMBERG, RESPONDENT.

No. 4580

May 2, 1963                                    381 P.2d 221

---

[1]Neither Exhibit "A" nor "E" expressly refers to the other. The doctrine of incorporation by implied reference is employed by appellant to permit their incorporation. This doctrine is referred to in Restatement, Contracts § 208. See Annot., 81 A.L.R.2d 991. Cf. Bowker v. Goodwin, 7 Nev. 135.

*Guild, Busey & Guild,* of Reno, for Appellant.

*Stanley H. Brown* and *John S. Belford,* of Reno, for Respondent.

## OPINION

By the Court, BADT, C. J.:

This appeal requires a determination of the rights and obligations of the parties under an option from Finnell to Bromberg for the purchase of certain corporate stock owned by the former. The trial court found that Bromberg had notified Finnell of his exercise of the option to purchase the stock and tendered the option price thereof,

and that upon Finnell's rejection Bromberg was entitled to judgment for damages in the amount of the difference between the option price and the price to which the stock had advanced on the exchange at the time of Finnell's breach. Judgment was entered in favor of Bromberg in the sum of $99,484.93. A statement of the facts follows.

The option was in the following words:

"The undersigned hereby grant to Leo Edwin Bromberg the option to purchase the corporate stock hereinafter referred to on the following terms and conditions:

"1.   The option covers the stock of Barnhart Morrow Consolidated represented by Certificate No. TB558 for 45,000 shares, Certificate No. TB559 for 61,060⅔ shares, Certificate No. TB560 for 10,000 shares.

"2.   The option can be exercised only after March 1, 1959 and before June 23, 1959 by notice in writing and tender of the purchase price in the form of cashier's check or money order.

"3.   The purchase price of said shares shall be 60¢ per share for shares represented by Certificate Nos. TB559 and TB560 and 75¢ per share for shares represented by Certificate No. TB558.

"4.   In consideration of this option the undersigned acknowledges receipt of the sum of $5,000.00 which sum represents consideration for this option and is not to be deemed as part of the purchase price for said stock.

"Dated:  2 January 1959

"/s/   Mrs. Imogene C. Wilson
"/s/   Mrs. Florence C. Jones
"/s/   Mrs. Leone C. Finnell"

On May 20, 1959, Bromberg sent the following telegram to Finnell and her sisters, the other two optioners.[1]

"I HEREBY EXERCISE OPTION TO PURCHASE BARNHART–MORROW CONSOLIDATED CERTIFICATE NO. TB558 FOR 45,000 SHARES AT 75¢ PER

---

[1]The option to purchase the stock of Mrs. Wilson and Mrs. Jones (Mrs. Finnell's sisters) is not involved in this appeal, which is restricted to Mrs. Finnell's 61,060⅔ shares, at 60¢ a share, represented by Certificate TB559, and her Certificate No. TB560 for 10,000 shares at 60¢ a share.

SHARE, NO. TB559 FOR 61,060⅔ SHARES AT 60¢ PER SHARE AND NO. TB560 FOR 10,000 SHARES AT 60¢ PER SHARE, FOR A TOTAL CONSIDERATION OF $76,386.40. PLEASE DEPOSIT SAID CERTIFICATES EVIDENCING SAID NUMBER OF SHARES WITH THE BANK OF AMERICA, WILSHIRE SWEETZER BRANCH, 6507 WILSHIRE BOULEVARD, LOS ANGELES 48, CALIFORNIA, ESCROW NO. 9748, AND BANK OF AMERICA WILL MAKE PAYMENT FOR SAID SHARES IMMEDIATELY UPON RECEIPT FROM YOU. BANK OF AMERICA WILL MAIL YOU ESCROW INSTRUCTIONS FOR SIGNATURE TODAY. KINDEST PERSONAL REGARDS."

On the same date he wrote Mrs. Finnell at her Reno address and Mrs. Jones and Mrs. Wilson at their respective Los Angeles addresses, in virtually the same words and figures contained in the telegram.

On the same date the Bank of America, Los Angeles, wrote Finnell at Reno as follows:

"We enclose a copy of escrow Instructions for your signature. When we are in receipt of this Instruction signed by all parties and the Stock certificates listed therein, we will present the Certificate and proceed as per Instruction.

"If the cashier's check in the amount of $76,386.40 is to be divided between Imogene C. Wilson, Florence C. Jones and Leone C. Finnell in this escrow, we will require written instructions signed by all three as to the exact amount of the checks to be issued to each party, otherwise we will issue one check in the amount of $76,386.40 payable to the order of all three. A self-addressed envelope is enclosed for your convenience in returning the signed escrow instruction to this office."

The escrow instructions referred to contained, first, some two pages of printed matter holding the bank harmless against everything "except gross negligence or willful misconduct," and authorized the bank, in the event of any controversy between the parties or with any third person, to await the settlement thereof by

final appropriate legal proceedings, "notwithstanding anything in the following instructions to the contrary." This is followed by the provision for the payment by Capital Factors of $25,000 and for payment by Bromberg of $51,386.40, making a total of $76,386.40, which was to be delivered by cashier's checks to Finnell and her two sisters.[2] It is then provided: "Upon issuance of the above mentioned cashier's check, the undersigned [Wilson, Jones, and Finnell] will have no further interest in this escrow."

It is then provided that Bromberg deposit a $25,000 note payable to Capital Factors and 38,500 shares of Barnhart Morrow stock (furnished by Barnhart Morrow), "whereupon Capital Factors will have no further interest in this escrow."

The bank is then to hold the residue of the stock until it has received $85,000 with orders for stock per a written form attached and such sum is to be used for payment by the banks of bills in accordance with an attached list, and Barnhart Morrow is to deposit its note for $85,000 for delivery to Bromberg when payment of the bills has been made. The escrow may then be closed.

The form attached to the escrow instructions whereby subscribers to Barnhart Morrow stock deposit their money, provided that all such funds "be held by you until the entire block of shares to be sold through this escrow has been so deposited as set forth in the escrow instructions."

The parties entered into a stipulation as to the facts, including the following:

"On or about January 2, 1959, plaintiff and defendant entered into an option agreement * * *. Under this agreement defendant gave to plaintiff an option to purchase 71,060⅔ shares of the stock of Barnhart Morrow Consolidated at the price of sixty cents a share. The option could be exercised between March 1, 1959, and June 23, 1959. Plaintiff paid defendant and her two sisters $5,000.00 for said option.

---

[2] See footnote 1.

"On or about May 20, 1959, plaintiff had caused to be deposited in escrow with the Bank of America, Wilshire-Sweetzer Branch, in Los Angeles $76,386.40. * * * From this amount $42,636.40 was to be paid to defendant when she deposited in the escrow the stock called for by the option.

"On or about May 20, 1959, plaintiff wired and wrote to defendant, advised her of his exercise of the option, that the bank would make payment to her immediately upon the receipt of the shares and that the bank would send escrow instructions for her signature. By letter dated the same day the bank sent the escrow instructions to defendant.

"On May 20, 1959, the market price of the stock was $2.00 per share.

\* \* \* \* \*

"After March 31 and prior to May 20, a Mr. Turnbull told defendant that she did not need to deliver the stock.

"There is some conflict in the testimony as to telephone calls concerning the delivery of the stock by defendant. Portions of that testimony were:

"Mr. Talis testified:

" 'I called her person to person. I believe she was here in Reno, and I said I was Mr. Bromberg, and I said I had understood that she said she would deliver the stock today, Monday [June 1, 1959], during banking hours and since it hadn't arrived I was calling her in an effort to try and find out when the stock would arrive. Her answer to this was—I will try to describe it as closely as I can, that she was going to deliver the stock except that she was waiting to find out from Mr. Bromberg—or me, I presume she thought I was Mr. Bromberg—if she could deliver the stock without signing the escrow agreement. She definitely was not going to sign it. I told her arrangements had been made at the Bank of America that they would accept the stock without her signature on the escrow agreement, and they would give her her check. She said under those conditions she would be down to the bank tomorrow with her sister—do you want me to continue?

" 'Q    Yes.

" 'A    At the end of the business day the following day, the stock had not arrived and I called Mrs. Finnell again long distance. I said it was Mr. Bromberg's office calling; the stock did not arrive; when did she plan on bringing it down. At that point she said she had received advice that her option agreement was illegal and that she wasn't bound by it and didn't have to deliver the stock. I asked who gave her that advice, was it an attorney. She said, "That's my business. That is advice I had and the advice I have taken, and I am not going to deliver the stock." '

"Plaintiff testified:

" 'A    Mrs. Finnell did not want to sign the escrow instructions. She did not want to become a party to the escrow.   *   *   *

" 'Q    What else did she tell you?

" 'A    She also told me she would deliver the stock on the following Monday, her sister had the stock, it would be delivered the following Monday to the bank to pick up the money.

" 'Q    But she said she didn't want to sign the escrow instructions?

" 'A    That is right. I told her it was not necessary for her to sign the escrow instructions.'

"Defendant testified:

" 'Q    And what did you say then with reference to the escrow instructions?

" 'A    I told this man that called me the reason why we didn't want to sign the escrow papers.

" 'Q    Then you were subsequently informed that you didn't have to sign them?

" 'A    He told us he would present us a check without our putting the stock in escrow.

" 'Q    Well, didn't he tell you he had made arrangements with the bank so the stock would be put in escrow without your signing the instructions?

" 'A    No, he did not.'

"Defendant testified that she did not receive the letter from the bank until May 28th or 29th. Plaintiff disputes this.

*   *   *   *   *

"It is further stipulated and agreed that the Court may consider the matter on the record and briefs, make its Findings of Fact and Conclusions of Law and enter its decree."

The trial court found, in part, as follows:

"II On January 2, 1959, in consideration of the payment to her of $5,000.00 by plaintiff, defendant Finnell at Los Angeles, California, granted, in writing, to plaintiff, the right and option to purchase from her 71,060⅔ shares of said capital stock at the price of sixty cents per share, said option to be exercised after March 1, 1959, and prior to June 23, 1959.

"III On May 20, 1959, plaintiff had caused to be deposited in escrow with Bank of America, Wilshire-Sweetzer Branch, Los Angeles, California, the sum of $76,386.40, with instructions to pay the same by cashier's check to defendant Finnell, and Imogene C. Wilson and Florence C. Jones, upon receiving from them said stock certificates, together with an additional certificate held by the said Imogene C. Wilson and Florence C. Jones. Of said amount, $42,636.40 was due to defendant Finnell for her said shares.

"IV On May 20, 1959, plaintiff, by telegram and letter, notified defendant Finnell, and Imogene C. Wilson and Florence C. Jones that he exercised said option and that upon deposit of said stock certificates with said escrow holder it would immediately make payment to her therefor.

"V After the said exercise of the option defendant Finnell told plaintiff's agent that she would not sign the proposed escrow instructions and was told by him and by plaintiff that she did not need to do so and that if she would deliver the stock certificates to the escrow holder she would be paid therefor.

"The next day she told said agent that she had received advice that the option agreement was illegal, that she was not bound by it and did not have to deliver the stock.[3]

---

[3]As noted above, the testimony supporting this finding went still further. Following the recital in the above finding, the witness testified: "I asked her who gave her that advice, was it an attorney. She said, 'That's my business. That is advice I had and the advice I have taken, and I am not going to deliver the stock.'"

"At no time prior to June 11, 1959 did defendant specify the form or mode of tender that she would accept.

\* \* \* \* \*

"VII From and including May 20, 1959, to and including May 25, 1959, the market value of said stock was $2.00 per share. From and including May 26, 1959, to and including May 29, 1959, the market value thereof was from $1.80 to $1.90 per share.

"VIII That the difference between the option price of said stock of sixty cents per share and the market value thereof of $2.00 per share is $99,484.93."

Although Finnell has not filed or included in her brief any definite specification of errors, the grounds of her appeal are, we think, made clear.

1. Appellant states: "The primary question is whether or not Bromberg legally exercised the option by setting up the bank escrow." Finnell's contention is that this was not a proper or legal exercise of the option. It is apparent from what follows that the escrow here referred to by Finnell is the escrow set up by the bank's written instructions heretofore discussed in some detail. Finnell discusses these instructions at great length, indicating that they brought in new parties to the transaction, with complications of money being furnished by other people through the purchase of stock and relieving the bank from the necessity of making any distribution whatsoever until all the stock was paid for and the money appropriated to the purposes discussed in the written instructions. Although not necessary to our decision, a careful study of such escrow instructions shows that Finnell had nothing to fear from this source. The instructions clearly declared that upon deposit of the stock, the money would be immediately paid, and Finnell would have no further interest in the escrow.

Finnell contends that an option must be unequivocally accepted according to its terms in order to constitute a legal and binding acceptance. Many authorities are cited

in support of this proposition. Bromberg does not contest this rule and it is undeniably good law. The option provided that it could be "exercised only after March 1, 1959 and before June 23, 1959 by notice in writing and tender of the purchase price in the form of cashier's check or money order." Bromberg's telegram and letter of May 20, 1959, stated unequivocally, "I hereby exercise option to purchase * * *. Please deposit said certificates * * * with the Bank of America * * * and Bank of America will make payment for said shares immediately upon receipt from you. * * *" The bank under the same date wrote Finnell, "We enclose copy of escrow Instructions for your signature. When we are in receipt of this Instruction signed by all parties and the Stock certificates listed therein, we will present the Certificate and proceed as per Instruction." It was stipulated as an agreed fact that the money covering the option price of the certificates was at all times on deposit with the bank. The written instructions to the escrow holder were to deliver cashier's check when the bank held the certificates, upon which Finnell "will have no further interest in this escrow."

Whether with or without justification, Finnell absolutely refused to sign the escrow instructions; and it is true that the indications in Bromberg's letter and telegram and the bank's letter that her signing of such escrow instructions would be required.

Talis testified, and the court found in accordance therewith, that upon Finnell's refusal to sign the escrow instructions he advised her that it was unnecessary for her to do so, that the money was at the bank, and that upon presentation of the stock certificate, cashier's check would be delivered to her. Much space is devoted in Finnell's brief to the contention that this was a modification of the option and that as the acceptance of the option was required to be in writing, so was any modification. We need not enter into this discussion. The gist of the situation is that on May 20, 1959, Bromberg definitely notified Finnell of the exercise of the option, that the money was at the bank (which fact is conceded),

and that upon receipt of the stock the bank would make payment. This was the exercise of the option, and the unilateral contract created by the option immediately became a bilateral contract between Finnell and Bromberg. A clear statement of such situation appears in 1 Corbin, Contracts § 264, at 876: "[I]n specifying the mode of acceptance and the condition of his duty, the option giver can cause the contract either to remain unilateral as before the acceptance or to become bilateral. The specified condition can be either the actual rendition of a definite performance (such as payment of the price) or the making of a promise of such performance. The difference that it makes is this: first, it determines the manner in which the option holder must accept—the character and limits of his power; secondly, it answers the question whether the option giver can maintain any action, for either damages or specific performance, against the option holder. In most cases, the courts are likely to interpret the agreement in such a way that the contract will be held to be bilateral after a proper notice of acceptance. In such cases, the notice of acceptance is operative without any tender of the price; and this is true even though such tender may still be a condition of the duty to execute a conveyance."

This court took the same view in Milner v. Dudrey, 77 Nev. 256, 362 P.2d 439. The optionee gave notice of exercise of her option to purchase in words less certain than the notice of election in the present case. The option in Milner required: "If the survivor shall elect to purchase * * * such notice of election shall be given in writing * * * within fifteen days * * * and shall tender therewith a good faith deposit of not less than $10,000.00." The notice of election recited, "I am advised that a deposit of $10,000.00 will be made forthwith at the First National Bank * * *." This court held, first, "An option is exercised by the giving of an unconditional notice that the holder does elect to exercise it. (citing authorities) * * * In this case the letter * * * with the statement that $10,000 was being deposited, certainly indicated the intent to be bound by this notice

accepting the option. * * * the letter * * * constituted written notice of present election to exercise the option." Accord: Bonde v. Weber, 6 Ill.2d 365, 128 N.E.2d 883. This court next considered the contention that the deposit of the check in the First National Bank of Nevada in Las Vegas was not proper tender, "because it was not tendered to the executrix, or her attorney, or any of their heirs." (The principal administration was in California, with ancillary administration in Nevada. The option had been set up in a partnership agreement, giving the surviving partner an option to purchase the interest of the deceased partner.) The agreement provided that the notice of election to exercise the option shall be given in writing to the legal representative of said deceased within fifteen days after the date of death and shall tender therewith a good-faith deposit of not less than $10,000. It required, not a deposit in bank, but that the optionee shall tender the deposit of $10,000. This court held that the deposit in bank with notice to the attorney who had represented the deceased and who represented the person named as executrix "was legally sufficient tender under the terms of the partnership agreement."

So we have the written exercise of the option on May 20, 1959, and the tender of the money on the same date. The time in which the option could be exercised and the tender made was after March 1, 1959, and before June 23, 1959.

Even without consideration of the fact that Bromberg had up to June 23, 1959, to make the tender, we consider Milner v. Dudrey, supra, direct authority for holding that the option had been duly exercised and a tender properly made. Accord: Killam v. Tenney, 229 Or. 134, 366 P.2d 739, 746; Bonde v. Weber, 6 Ill.2d 365, 128 N.E.2d 883, 888, 889; H. M. R., Inc. v. Boeckenhauer, 24 Ill.2d 65, 179 N.E.2d 613, 615.

It should be noted that Finnell contends not only that the written escrow instructions submitted to her by the bank for her signature with the information that the money was on deposit and would be paid immediately

upon presentation of the stock was not a proper exercise of the option, but also that the situation whereunder she was notified that the money was in the bank for immediate payment on delivery of the stock was not a compliance with the option requirement for a tender by cashier's check or money order. If she doubted that the money was at the bank, this could have been most simply verified by an inquiry. It should be remembered that the option contract was executed not only by Mrs. Finnell but also by her two sisters, each of whom had a block of stock in the corporation. The acceptance of the option was likewise directed to all three. Mrs. Finnell lived in Reno, but the two sisters lived in Los Angeles. Mrs. Finnell made no objection to the fact that the deposit had been made in the Bank of America at Los Angeles. She did not even make the suggestion that it would be more convenient to her if the money were deposited at her bank at Reno. Indeed the testimony shows that it was contemplated by Mrs. Finnell that all the stock would be deposited by her sister in Los Angeles. There is no occasion for applying or further investigating the rule relied upon by Finnell as stated in 86 C.J.S., Tender § 19, at 568, as follows: "A deposit in a bank or other designated place of payment, on the day fixed, of the amount due is a good tender if the obligation is payable at such bank or depository, but not otherwise." Indeed the text goes on to express the general rule that this objection is generally considered waived by a failure to object. We are satisfied that the deposit in the bank to the end that it might be picked up upon the deposit of the stock was the reasonable way to make the tender. One would otherwise have to picture the awkward situation where the tenderer offers the cashier's check with one hand while holding out the other hand to receive the stock. If a group of stock certificates should be tendered, it would be necessary to examine each certificate and tally the total of the shares represented. And the other party would have to examine the check to determine if it were in the proper sum and properly executed by the cashier or assistant cashier of

the bank. Business is simply not ordinarily conducted in such manner in these days. The safe, reasonable, convenient, businesslike, and customary manner of closing such a transaction is through a bank.

2. A tender is excused where the vendor has repudiated the contract. H. M. R., Inc. v. Boeckenhauer, supra, and cases therein cited. As stated in 17 C.J.S., Contracts § 472, at 973: "Where a party bound by an executory contract repudiates his obligation before the time for performance, the promisee has, according to the great weight of authority, an option to treat the contract as ended so far as further performance is concerned, and to maintain an action at once for the damages occasioned by such anticipatory breach."

This leads us to the question discussed at length by both parties whether or not Finnell repudiated the contract at a time when Bromberg still had some three weeks to make his tender. We have referred to the court's finding that Finnell told Bromberg's agent that she had received advice that the option contract was illegal, and that she was not bound by it and would not have to deliver the stock; and to the testimony that Finnell said that she had taken such advice and was not going to deliver the stock. This, in our opinion, is a classic example of an anticipatory breach, although the parties discuss it under the proposition of whether or *not there was a repudiation. Mrs. Finnell denied this* and asserted that she had only refused to sign the formal escrow instructions. This direct contradiction was, as noted, resolved by the trial court.

3. However, appellant contends that, as the case was originally tried before Judge A. J. Maestretti who died before deciding it and then, by stipulation of the parties, was submitted to Judge John W. Barrett upon the testimony taken before Judge Maestretti, our rule, uniformly

applied, that we will not disturb a finding made by the trier of the facts where the facts are in dispute or where there is substantial evidence to support the finding, does not apply. She contends that under such circumstances this court may ignore the findings of the trial court and may substitute its own, and she cites many federal cases supporting in more or less degree such contention. While such may be the rule in the federal courts, it is not the rule in this state.

In Garaventa v. Gardella, 63 Nev. 304, 309–313, 169 P.2d 540, 543–545, it was urged, under an exactly similar situation, that "we should reexamine the entire case, determine for ourselves the weight of the evidence and credibility of the witnesses, and draw our own conclusions." That is what we are urged to do here. The question was discussed at length under our constitutional provisions for original jurisdiction in the district court and appellate jurisdiction only in this court. We there said: "In our opinion the correct rule is that even where the evidence was all in writing, the trial court's findings will not be set aside unless clearly or manifestly against the weight of the evidence, or without any reasonable support therein. Of the numerous authorities sustaining this rule, we cite but a few which give the reasons for their holdings.

\* \* \* \* \*

"The conclusion we have reached in the foregoing discussion is based squarely upon the ground that in cases like the present this court has no power or jurisdiction to weigh the evidence without regard to the findings of the trial court, but can only consider the evidence for the purpose of determining whether there was any substantial evidence to support such findings, and whether the conclusions reached by the lower court were clearly wrong."

We again considered the question in Sisson v. Sisson, 77 Nev. 478, 367 P.2d 98, and adhered to Garaventa. Finnell claims that the testimony on which Bromberg relies is incredible, but we do not find it so.

4. Appellant contends that the finding of damage in the sum of $99,484.93 is not supported by the evidence. We have seen that Finnell repudiated her option contract on June 2, 1959. The judgment was based on the difference between the market value of the stock at $2.00 per share, namely, $142,121.33 and the stock at the option price of 60 cents per share or the sum of $42,636.40. Two dollars per share was the value of the stock on May 25, 1959. From that date to May 29 it varied between $2.00 and $1.80, but no value of the stock appears as of June 2. Bromberg supports the finding of damage under the following rule quoted from 18 C.J.S., Corporations § 414, at 1001: "Where the purchase price has not been paid, the measure of damages is ordinarily the difference, if any, between the contract price and the market value of the stock at the time when and where it should have been delivered, together with interest thereon from the time of the breach * * *." He then points out that the record shows a market value of at least $2.00 per share from May 20 through May 25, 1959. It is then his theory, developed during the oral argument, that as he had accepted the option on May 20 it was presumably the thought of the trial court that five days constituted a reasonable time for delivery of the stock, and that on such date the breach occurred, so that May 25 should be the date on which the value of the stock should be based. However, there is nothing in the record to show that such theory was the basis of the court's judgment, or any evidence of rule or custom on the stock exchange or otherwise in support thereof.

It was not until June 2, 1959, that Finnell repudiated the contract. Up to that date Bromberg was willing to accept the stock. He kept importuning Mrs. Finnell, as late as June 1 and June 2, 1959, to deliver it to the bank. He did not consider that there was a breach on May 20 or May 25 or at any time until June 2. He commenced his action on June 11. The only real basis for fixing the damage would be the value of the stock on June 2, 1959.

We consider that the judgment must be affirmed in all respects, except the fixing of the amount of damage and that the case must be remanded for a limited new trial on this issue. It is so ordered. No costs are awarded.

McNAMEE, J., concurs.

THOMPSON, J., concurring:

This case was presented to the lower court and here on the proposition that Finnell's breach of the option contract occurred when she failed to deliver her stock into escrow at the Los Angeles bank within a reasonable time after Bromberg had exercised his option to purchase. On May 20, 1959 Bromberg gave written notice of election to exercise his power of acceptance and also made a tender of the purchase price through escrow. Nothing remained for him to do, assuming that his tender of the purchase price through escrow was a proper tender. The legal battle was waged below and here over this point, i.e., whether the tender of payment through escrow was legally sufficient. I agree with my colleagues that it was. The escrow instructions are clear that, upon deposit of the stock, the money would be immediately paid and Finnell would have no further interest in the escrow. This fact alone distinguishes this case from McCall v. Carlson, 63 Nev. 390, 172 P.2d 171, so heavily relied on by appellant. As to Finnell, the escrow arrangement here proposed amounted to no more than a request that she deliver the stock to the bank as Bromberg's agent, rather than to Bromberg directly. No conditions were imposed to give cause for complaint that Bromberg had not met the terms of the option contract. Accordingly, I find no impropriety in using the market value of the stock on May 25, 1959 for the purpose of computing damages. It was Finnell's duty to deliver the stock within a reasonable time after May 20, 1959. Thus, I am not prepared to state, on this record, that the trial court erred in deciding that five days was a reasonable time to require Finnell's performance. Therefore, I would affirm the judgment below without remand for a limited new trial.

Had the case been presented on the theory that Finnell's unequivocal repudiation of the option contract on June 2, 1959 ("I am not going to deliver the stock."), was an anticipatory breach of her obligation to do so, a remand for a limited new trial would be appropriate.[1] However, the theory of anticipatory breach, as applied to this case, assumes that Bromberg had not completely exercised his option on May 20, 1959. Only if we were to decide that Bromberg's tender of payment through escrow was improper, or if we refused to decide that question at all, would the theory of anticipatory breach, as a predicate for recovery, come into the case. In that event the record would support the following: (a) on May 20, 1959, Bromberg gave written notice of election to exercise his power of acceptance. 1 Corbin, Contracts § 264, at 876; Milner v. Dudrey, 77 Nev. 256, 362 P.2d 439;[2] and (b) on June 2, 1959 Finnell unequivocally repudiated the option contract when 21 days still remained within which Bromberg could tender payment of the purchase price. Such repudiation was an anticipatory breach excusing the tender of payment by Bromberg, 4 Corbin, Contracts, at 920, and giving him immediate cause for suit without waiting for the option period to expire. 4 Corbin, Contracts, at 853; Bonde v. Weber, 6 Ill.2d 365, 128 N.E.2d 883; cf. Cladianos v. Friedhoff, 69 Nev. 41, 240 P.2d 208.[3]

Thus it is manifest that the distinction between the two possible theories of recovery (each being supported by the record) may affect the amount of damages to which Bromberg is entitled. The market value of the stock fluctuated during May 1959. Its value on June 2, 1959 (the date to be used for fixing damages if the

[1]The record does not disclose the market value of the stock on June 2, 1959. Hence, a remand for that determination would be needed to fix damages.

[2]The present case is to be distinguished from those cases in which the option holder is to exercise his option *only* by the unilateral act of tendering payment of the purchase price. See: Bourdieu v. Baker, 6 Cal.App.2d 150, 44 P.2d 587, as an example.

[3]The record shows that suit was commenced on June 11, 1959. The option period did not expire until June 23, 1959.

theory of recovery is anticipatory breach) may be greater or less than it was on May 25, 1959 (the date which the trial court presumably used, believing that Bromberg's tender of payment through escrow was proper). I believe that an appellate court should sustain a judgment upon the theory presented by counsel and used by the trial court, if it is sustainable on that ground. Cf. Nelson v. Sierra Construction Corp., 77 Nev. 334, 364 P.2d 402 (concurring opinion). However, as the judgment in Bromberg's favor is also sustainable on the theory of anticipatory breach, with a remand for the sole purpose of recomputing his damages, I will concur in the result.