Argued September 18, affirmed October 21, rehearing denied December 23, 1919.

# OREGON  HOME  BUILDERS *v.* MONTGOMERY INV. CO.

### (184 Pac. 487.)

**Trial—Finding of Facts by Judge Specific as in Special Verdict.**

1. Where the parties to an action waive their rights to a jury, the findings of the trial judge are in the nature of a special verdict, and the judge must find the facts as particularly as is required in a special verdict returned by a jury.

**Trial—Finding of Facts by Special Verdict.**

2. A special verdict must find all the facts essential for a judgment, but ultimate and constitutive, rather than evidentiary, facts should be stated.

**Trial—Adequacy of Special Verdict Stating Findings on Issue Determining Case.**

3. A special verdict must pass on all the material issues, yet will be adequate if it states sufficient findings on an issue ultimately determining the case and necessarily supporting the judgment rendered so that other issues become immaterial.

**Trial—Findings of Judge Being Only Conclusions of Law Insufficient.**

4. If the findings made by the trial judge are not in truth findings of fact, but only conclusions of law, the judgment cannot stand because it must be supported by a statement of ultimate facts.

**Trial—"Evidentiary Fact" Defined.**

5. An "evidentiary fact" is one that furnishes evidence of the existence of some other fact.

**Trial—"Ultimate Fact" Defined.**

6. An "ultimate fact" is the final resulting effect reached by processes of legal reasoning from the evidentiary facts.

**Pleading—Affirmative Allegation in Answer as Denial of Affirmative Allegation in Complaint.**

7. In a broker's action for commission on negotiating an exchange of properties, the affirmative allegation in the complaint that the purchaser procured owned his exchanged premises in fee simple, followed by denial in the answer, is sufficient after judgment and without timely objection, for the reason that such denial is the equivalent of an affirmative allegation of nonownership by such purchaser.

**Trial—"Fact in Issue" on Which Complaint is Based and Which Defendant Controverts.**

8. In a realty broker's action for commission in negotiating an exchange of properties, question of whether or not the purchaser pro-

cured was the owner in fee simple of his lands to be exchanged *held* a "fact in issue," defined as that on which plaintiff proceeds by his action, and which defendant controverts in his pleadings, so that findings thereon were findings of ultimate fact and not mere conclusions of law.

**Brokers—"Real Estate Broker" Defined.**

9. A "real estate broker" is one employed in negotiating the sale, purchase, or exchange of lands on a commission contingent on success.

**Brokers—Right to Commission on Refusal of Principal to Sell.**

10. A realty broker, employed to sell given lands or to find a purchaser ready, able and willing to buy, is entitled to commission when he introduces to his principal a person ready, able and willing to purchase on the terms fixed by the principal, even though the latter refuses to sell.

[As to the right of a broker to compensation for sale, lease, etc., defeated by act of the owner, see notes in 2 Ann. Cas. 184; 20 Ann. Cas. 1020.]

**Brokers—Construction of Contract to Pay Commission on "Consummation of Deal."**

11. In view of a stipulation that plaintiff broker's commission should be so much "of the price," engagement by the owner to pay commission if the broker found a buyer ready and willing to "consummate a deal" for the stipulated price *held* to be to pay commission on actual completion and carrying out of a contract of exchange of properties with a buyer procured by the broker.

From Multnomah: WILLIAM N. GATENS, Judge.

Department 1.

This is an action by a real estate broker to recover a commission. The Oregon Home Builders, plaintiff, and the Montgomery Investment Company, defendant, are corporations. The plaintiff is engaged in the business of a real estate broker. The defendant owned a four-story brick building and the land upon which it stood in Portland. On June 1, 1916, the defendant signed a writing which reads as follows:

"To the Oregon Home Builders:

"You are hereby employed and authorized to offer for sale or exchange and given the exclusive sale of the property described in the margin hereof, at the price and terms noted therein or at such other price

and terms as I may hereafter agree to. You are hereby authorized by me to accept a deposit to be applied on the purchase price of said property, and, in my name, to execute and deliver a binding written contract for the sale and conveyance of the said above described property. In the event that you find a buyer ready and willing to consummate a deal for said price and terms or on such other terms and price as may be agreed to by me, or place me in touch with a buyer to whom I at any subsequent time sell or convey said property, I hereby agree to pay you in cash, as a commission for your services, the following sums, to-wit: $750.00 cash of the price for which said property is sold or at which it is exchanged, which said commission I authorize you to retain out of the first money paid on the purchase price of said property as a deposit, or otherwise. I hereby warrant the information given in the margin to be true and that I am in peaceable possession of the said described property, that my title to the same is perfect, and is without encumbrance as stated, and that I will furnish a satisfactory abstract of title brought down to the date of sale, showing such title. In case of an exchange of my said property, I have no objection to your representing and accepting compensation from the other party to the exchange as well as myself. I agree to furnish an abstract of title to the date of sale. I further agree that this contract and the authority hereby conferred shall continue in effect until I give you ten days' notice of withdrawal.

"MONTGOMERY INVESTMENT Co.

"BAYARD T. ALLYN, Pres.

"A. J. DELANO, Treas.

"F. J. DELANO, Secy.

"West half of lots 7 and 8, Block 135, Portland, Multnomah County, Oregon, known as No. 386 Third Street, Portland, Ore., Price $70,000. Terms, exchange. Present encumbrance: Mortgage $25,000 at 7%. Are interest charges and all bonded assessments paid to date? Yes. City liens, bonded: None. Character of improvements: 4 story brick store and apartment."

Afterwards the plaintiff introduced to the defendant Claude D. Starr as a prospective purchaser. After "numerous negotiations" between Starr and the defendant, "in all of which said negotiations the plaintiff corporation assisted, associated and participated," the defendant and Starr signed a writing as follows:

"This Agreement, Made and entered into this 1st day of June, 1916, by and between The Montgomery Investment Company, a corporation, by its president and secretary, with the corporate seal, party of the first part, and Claude D. Starr, party of the second part, Witnesseth:

"That for and in consideration of the agreements hereinafter contained, the party of the first part agrees to sell to the party of the second part and the party of the second part agrees to purchase from the first party the following described property in Multnomah County, State of Oregon, to wit: [Here is described the land upon which the brick building is located.]

"Subject to a mortgage for the sum of $25,000.00, which said mortgage is due November, 1916.    Also to convey by bill of sale all the furniture, except personal effects, now in the above named premises, free and clear of all encumbrances.

"And in payment of the purchase price of the above described property, and in consideration of the conveyance thereof, the party of the second part agrees to sell and convey to the party of the first part the following described properties, situated in Multnomah and Clackamas Counties, State of Oregon, to wit: [After describing two lots in Portland, one of which was subject to a mortgage for $4,500, while the other is said to be clear of encumbrance, the writing described two tracts aggregating 232.72 acres located in Clackamas County.]    Same to be clear of all encumbrances.

"And the said party of the second part agrees to pay at the consummation of this transaction the sum of $5,000 in cash, to the party of the first part.

"All rentals, interest and adjustments to be made as of July 1, 1916. Deeds conveying said properties from one to the other of the parties hereto are to be good and sufficient warranty deeds conveying a fee simple title to the above described properties, free from all encumbrances except as herein mentioned, and said deeds shall be delivered from one to the other of the said parties hereto within a reasonable time. Abstracts of title or certificates of title to be furnished each party to the other to their respective properties, and a reasonable time shall be allowed for the correction of any defects that may appear."

The plaintiff was "the procuring cause of the execution of the agreement" made between the defendant and Starr.

On June 10, 1916, Starr submitted to the defendant abstracts of title covering the two Portland lots and the two Clackamas County tracts. The abstracts

"did not disclose that the said Starr was the owner in fee simple of the property situated in Clackamas County * * and did not disclose that said Starr had a marketable title thereto." In truth Starr "was not at any time prior to the commencement of this action the owner in fee simple of the real property known as the Clackamas County lands, and did not have a marketable title thereto but his title therein was defective."

On July 20, 1916, the defendant delivered to Starr a complete statement of its objections

"pointing out the defects to the title of said Clackamas County lands as shown by said abstract of title," and "refused to consummate said deal unless the defects so pointed out should be remedied within a reasonable time and on or before the 3d day of September, 1916."

Starr failed to correct the defects pointed out to him and he

"did not prior to the 3d day of September, 1916, or at all, tender to the defendant an abstract of title show-

ing that said defects or any of them had been remedied, or showing that the said Starr had or could convey a marketable title to said Clackamas County lands." On September 3, 1916, the defendant notified Starr "that on account of his failure and refusal to comply with said contract the defendant considered itself no longer bound thereby."

Starr had caused the written agreement which he and the defendant had signed to be recorded; and in February, 1917, he delivered to the defendant a quitclaim deed to the brick building. Up to and including the time when the quitclaim deed was delivered—

"Starr was not able to convey a fee simple or marketable title to said Clackamas County lands to the defendant, and neglected within a reasonable time after the defects to the title were pointed out to him by the defendant to cure said defects or any of them."

Starr was ready and willing at all times, however, to pay the defendant the $5,000 stipulated in the contract.

The plaintiff brought this action to recover $750, alleging that it had earned and was entitled to that sum as a commission under the terms of its contract with the defendant. The facts narrated in the foregoing statement are taken from the findings of fact made by the trial judge, who with the consent of the parties heard the cause without the aid of a jury. The judgment was for the defendant and the plaintiff appealed.

AFFIRMED.

For appellant there was a brief and an oral argument by *Mr. W. B. Shively.*

For respondent there was a brief over the names of *Mr. E. V. Littlefield* and *Messrs. Winter, Reams & Maguire,* with an oral argument by *Mr. Robert F. Maguire.*

HARRIS, J.—1-4. The plaintiff contends that the findings labeled "findings of fact," so far as they relate to Starr's title to and ownership in the Clackamas County lands, are no more than conclusions of law; and that therefore they are insufficient to support the judgment. Where the parties to an action at law waive their right to a jury, the findings made by the trial judge who hears and decides the cause are in the nature of a special verdict; and hence since the standard fixed for a special verdict is also taken as the standard for the "findings of fact," the trial judge must find the facts with the same degree of particularity as is required in a special verdict returned by a jury. A special verdict must find all the facts essential for a judgment; but ultimate and constitutive rather than evidentiary facts should be stated. Generally a special verdict must pass upon all the material issues; and yet a special verdict will be adequate if it states sufficient findings on an issue which ultimately determines the case and necessarily supports the judgment rendered so that other issues in the controversy become immaterial: *Turner* v. *Cyrus,* 91 Or. 462 (179 Pac. 279). If the findings made by the trial judge are not in truth findings of fact but in effect are only conclusions of law, then the judgment cannot stand because it must be supported by a statement of ultimate facts: 38 Cyc. 1979.

5, 6. An "evidentiary fact" is one that furnishes evidence of the existence of some other fact: 17 Cyc. 822. An ultimate fact is the final resulting effect which is reached by processes of logical reasoning from the evidentiary facts: 21 R. C. L. 438. In 8 Words and Phrases, 7144, it is said:

"Ultimate facts are, when considered with reference to the facts or evidence by which they are established

or proved, but the logical results of the proofs, or, in other words, mere conclusions of fact.''

It is sometimes difficult to distinguish between conclusions of fact and conclusions of law, because it may be that a statement of fact cannot be made without including a conclusion or it may be that a conclusion of law is such that, in the attending circumstances, it must be stated in the form of a statement of fact: 38 Cyc. 1979; *Levins* v. *Rovegno,* 71 Cal. 273 (12 Pac. 161); *Clark* v. *Chicago etc. R. Co.,* 28 Minn. 69 (9 N. W. 75).

''The line of demarcation'' as stated in *Levins* v. *Rovegno,* 71 Cal. 273, 275 (12 Pac. 161, 162), ''between what are questions of fact and conclusions of law is not one easy to be drawn in all cases. It is quite easy to say that the ultimate facts are but the logical conclusions deduced from certain primary facts evidentiary in their character, and that conclusions of law are those presumptions or legal deductions which, the facts being given are drawn without further evidence. This does not, however, quite meet the difficulty. We deduce the ultimate fact from certain probative facts by a process of natural reasoning. We draw the inference or conclusion of law, by a process of artificial reasoning; but this last process is often in such exact accord with natural reason that the distinction is scarcely appreciable.

''If ultimate facts were found only from direct evidence to the very fact, the distinction between them and conclusions of law would be easily drawn; but, as they are to a great extent presumed from the existence of other facts, they are conclusions reached by argument, by reason,—are results deduced from an inferential process, in which the evidentiary facts become the premises, and the ultimate fact the conclusion; and this process, by which ultimate facts or presumptions of fact are reached, differs from presumptions of law only in this, that the latter 'are reduced to fixed rules, and constitute a branch of the particular system of jurisprudence to which they belong'; the former being

'merely natural presumptions, are derived wholly and directly from the circumstances of the particular case, by the common experience of mankind, without aid or control of any rule of law whatever.' ''

Although it may not be possible to frame a formula which, in all cases, will serve as an unfailing test by which to determine whether a given deduction states an ultimate fact or a conclusion of law still,

"it is, in many cases," as said in *Levins* v. *Rovegno,* "the means by which the result is to be reached which must determine whether a given conclusion is one of fact or law. If, from the facts in evidence, the result can be reached by that process of natural reasoning adopted in the investigation of truth, it becomes an ultimate fact, to be found as such. If, on the other hand, resort must be had to the artificial processes of the law, in order to reach a final determination, the result is a conclusion of law": See, also, *Travelers' Ins. Co.* v. *Hallauer,* 131 Wis. 371 (111 N. W. 527).

In addition to the difficulty encountered in distinguishing between conclusions of law and ultimate facts it is also sometimes difficult to distinguish between inferential facts and ultimate facts; and because of this latter difficulty it has been suggested in one jurisdiction that in cases of doubt the only safe plan is to include all the facts in a special verdict on the theory that if it turns out that a given fact is only evidentiary no harm is done, but if such fact is ultimate, its presence is proper and its absence might be fatal: *Louisville etc. Ry. Co.* v. *Miller,* 141 Ind. 533, 549 (37 N. E. 343)'; *Republic Iron Steel Co.* v. *Jones,* 32 Ind. App. 189, 191 (69 N. E. 191).

It has been said that a fact in issue "is that upon which the plaintiff proceeds by his action, and which the defendant controverts in his pleadings": *Garwood* v. *Garwood,* 29 Cal. 514; *Glenn* v. *Savage,* 14 Or. 567,

574 (13 Pac. 442); *King* v. *Chase,* 15 N. H. 9 (41 Am. Dec. 675).

We now turn to the pleadings to ascertain what were the facts in issue. The complaint avers that the defendant owned the property upon which the brick building is located and that the plaintiff and defendant entered into an agreement under the terms of which the defendant agreed to pay plaintiff $750; that the plaintiff found a buyer "ready and willing to consummate an exchange thereof for other property upon such terms, conditions and for such price as should be agreed to by the defendant." It is next alleged in the complaint that the plaintiff produced Claude D. Starr and that Starr and the defendant entered into a contract for the exchange of their respective properties, and that under the terms of the contract the Clackamas County lands were

"to be clear of all encumbrances. That in and by said contract it is further provided that the said Starr should pay defendant the further sum of $5,000 in cash, and said contract further provided that all rentals, interest and adjustments were to be made as of July 1st, 1916; that deeds conveying said properties from one to the other of said parties were to be good and sufficient warranty deeds conveying a fee simple title to the property conveyed free from all encumbrances except as in said contract mentioned, and that said deeds should be delivered from one to the other of said parties within a reasonable time, and said contract further provided that abstracts or certificates of title were to be furnished by each party to the transaction to the other, covering their respective properties, and that a reasonable time should be allowed each party for the correction of any defects that might appear."

The complaint continues by alleging in paragraph IV:

"That at all times herein mentioned the said Claude
D. Starr has been and is now the owner in fee simple
of the properties described in paragraph III hereof
agreed by him to be conveyed to the defendant, and
the said Claude D. Starr has been at all times herein
mentioned and is now ready and willing to convey said
property and all thereof, subject only to the en-
cumbrances in said contract mentioned, by good and
sufficient warranty deed, as provided in said contract,
and has been at all of said times, and is now ready
and willing to pay defendant said sum of $5,000 in
cash, and at all times herein mentioned and is now
ready and willing to consummate said transaction for
the exchange of said properties in accordance with the
terms of said contract."

The answer admits that the terms of the contract
between the plaintiff and Starr are as alleged in the
complaint.   The answer admits that Starr is willing to
pay $5,000 but denies every other allegation in para-
graph IV.   In other words, the plaintiff says that
Starr "has been and is now the owner in fee simple" of
the Clackamas County lands, which according to the
terms of the contract were to be "clear of all en-
cumbrances"; but the defendant denies that Starr has
been or is now the owner in fee simple of these lands.

The answer contains some affirmative matter.   In
substance the defendant says in its answer that Starr
submitted abstracts but that they disclosed that he
"did not have a merchantable title to any of the real
property in Clackamas County"; that on July 19, 1916,
the defendant gave to Starr a complete statement of
its objections to the title to the Clackamas County
lands; that Starr made no attempt

"to correct any of objections made to the title as
shown by the abstract which was submitted to this de-
fendant, and that this defendant has never at any time
or at all been given or tendered an abstract to the title

showing a merchantable title to the lands in Clackamas County, Oregon.''

The answer concluded by averring that on account of the failure of Starr to submit an abstract within a reasonable time ''showing a fee-simple title to'' the Clackamas County lands, the defendant notified Starr on September 6, 1916, that the contract was canceled ''on account of his inability to deliver to this defendant a merchantable title to the property in Clackamas County.''

7, 8. All this affirmative matter in the answer was denied by the reply. In other words, the defendant says, but the plaintiff denies, that the abstracts submitted by Starr disclosed that he did not have a merchantable title; and that Starr failed to furnish an abstract showing that he owned the Clackamas County lands in fee simple. It is true that the defendant did not directly allege in its answer that Starr was not the fee-simple owner of the Clackamas County lands; but it is also true that the complaint alleged that Starr was the fee-simple owner of the premises and this allegation of the complaint was denied by the answer, thus forming an issue upon the question as to whether Starr owned the Clackamas County lands in fee simple. It will be observed, too, there are numerous averments in the answer about the abstracts not disclosing a marketable title or fee-simple ownership. It may be assumed, without deciding, that in order to prevail the defendant must aver that Starr was not the fee-simple owner of the premises; and yet, notwithstanding such assumption, the answer must be held sufficient after judgment and in the absence of a timely objection, for the reason that the affirmative allegation in the complaint that Starr owned the premises in fee simple followed by the

denial in the answer is taken as the equivalent of an affirmative allegation in the answer of nonownership: 31 Cyc. 716; *Treadgold* v. *Williams,* 81 Or. 658, 663 (160 Pac. 803); *Hodson-Feenaughty Co.* v. *Coast Culvert & Flume Co.,* 91 Or. 630 (178 Pac. 382, 387). The question of whether or not Starr was the owner in fee simple of the Clackamas County lands was a "fact in issue" within the definition already given of "a fact in issue," for the Montgomery Investment Company defends, in part at least, upon the circumstance that Starr did not own these lands in fee simple. If the fact that Starr was not the fee-simple owner of the premises is, together with the other facts recited in the findings, sufficient to defeat the claim of plaintiff, then the statement of that fact, together with the other recited facts, is enough to support the judgment.

Ownership may be pleaded as an ultimate fact and *a fortiori* ownership may be stated as an ultimate fact in a special verdict or in the findings of fact made by a trial judge. Whether a finding of ownership is a finding of fact or a conclusion of law may of course depend upon the issues to be tried. We think that the findings about the ownership of the Clackamas County lands are findings of an ultimate fact. The trial court intended that the finding about ownership should serve as a finding of fact. This intention is made clear by the circumstance that this finding appears among the findings of fact and the additional circumstance that there is an appropriate finding of nonownership among the conclusions of law. The record presented to us does not contain any evidence, if any there was, taken at the trial; but the controversy is presented upon the pleadings and the findings made by the trial judge. The record does not disclose any request made by the plaintiff for more detailed findings about the question

of ownership. Moreover, it is stated in the printed brief filed by the defendant that

"the findings of fact * * were agreed to by plaintiff and its counsel to the effect that Starr did not have a marketable, fee-simple title to the Clackamas County lands."

The following precedents support the holding that a finding of ownership may be the finding of an ultimate fact: *Curtis* v. *Boquillas Land etc. Co.,* 9 Ariz. 62 (76 Pac. 612), 8 Ariz. 258 (71 Pac. 924); affirmed in 200 U. S. 96 (50 L. Ed. 388, 26 Sup. Ct. Rep. 192, see, also, Rose's U. S. Notes); *Savings & L. Soc.* v. *Burnett,* 106 Cal. App. 106 (93 Pac. 900); *Levins* v. *Rovegno,* 71 Cal. 273 (12 Pac. 161); *Ybarra* v. *Sylvany,* 3 Cal. Unrep. Cas. 749 (31 Pac. 1114); *Travelers Ins. Co.* v. *Hallauer,* 131 Wis. 371 (111 N. W. 527).

9, 10. Stated in general terms, a real estate broker is one employed in negotiating the sale, purchase or exchange of lands on a commission contingent on success: 9 C. J. 510; 4 R. C. L. 242; *Rodman* v. *Manning,* 53 Or. 336 (99 Pac. 657, 1135, 20 L. R. A. (N. S.) 1158). The broker is not entitled to a commission unless he accomplishes what he was employed to do: 9 C. J. 588. Although every agreement is of course governed by its own language, yet if the contract states in general terms that the broker is employed to sell given lands or is employed to find a purchaser who is ready, able and willing to buy, he performs his duty and is entitled to a commission when he introduces to his employer a person who is ready, able and willing to purchase upon the terms fixed by the employer, even though the latter refuses to sell: *York* v. *Nash,* 42 Or. 321, 330 (71 Pac. 59). In this class of cases the broker has done all that he has agreed to do, while the employer simply declines to avail himself of what the broker has done in pursu-

ance of his employment. The fact that the broker introduces a customer who is ready, able and willing to purchase on the terms offered by the employer entitles the broker to payment of the stipulated commission.

There is another class of cases where the broker brings about the execution of a contract between his employer and a third person for the sale or exchange of lands. The courts are practically unanimous in holding that a broker employed to sell or exchange lands earns his commission, unless the contract of employment contains a stipulation to the contrary, when a customer and the employer enter into a valid and binding contract for the sale and exchange of lands. In a few jurisdictions the introduction of a customer by the broker is an implied representation by the broker that the customer is able to carry out the contract to buy or exchange; and hence in those few jurisdictions if a contract is made between an employer and customer and is not completed on account of the inability of the customer to buy or exchange, the broker cannot recover any compensation: *Butler* v. *Baker,* 17 R. I. 582 (23 Atl. 1019, 33 Am. St. Rep. 897); *Riggs* v. *Turnbull,* 105 Md. 135 (66 Atl. 13, 11 Ann. Cas. 783, 8 L. R. A. (N. S.) 824), but the literally overwhelming weight of authority is that, unless the employer and broker have stipulated to the contrary, the broker has fully earned his commission when the customer and employer enter into a valid and binding contract for the sale or exchange of lands and the broker's right to recover a commission is not, in the absence of bad faith upon his part, defeated or even affected by the fact that it subsequently develops that the customer is unable to complete his contract to buy on account of financial inability or is unable to complete the contract to exchange on account of inability to transfer a merchantable title. When a broker

employed to sell or exchange lands presents a customer, there are, as stated in *Roche* v. *Smith,* 176 Mass. 595 (58 N. E. 152, 79 Am. St. Rep. 345, 51 L. R. A. 510), three courses open to the employer:

"1. He may examine the title of the customer, and accept him or not accept him on learning the result of the. examination; 2. He may enter into a contract with him, in which it is provided that his title shall be examined, and if it turns out that his title is not good the contract is at an end; or 3. He may enter into a binding contract with him for the conveyance of the land."

If the employer takes the third course, he in effect says to the broker:

"I accept the customer as a person ready, able and willing to purchase or exchange lands, as the case may be; you have done what you agreed to do; I have accepted the services rendered by you; and you have earned your commission."

The employer has a reasonable opportunity to investigate the ability of the customer to perform and when, without fraud or misrepresentation on the part of the broker, the employer accepts the customer by effecting a valid and binding contract with him, it is equivalent to a determination that the customer is a person ready, able and willing to purchase or exchange and the employer is estopped thereafter to deny the ability or willingness of the customer to complete the contract: *Stewart* v. *Will,* 65 Or. 138, 140 (131 Pac. 1027); *Roche* v. *Smith,* 176 Mass. 595 (58 N. E. 162, 79 Am. St. Rep. 345, 51 L. R. A. 510); *Francis* v. *Baker,* 45 Minn. 83 (47 N. W. 452); *Fox* v. *Ryan,* 240 Ill. 391 (88 N. E. 974); *Moore* v. *Irvin,* 89 Ark. 289 (116 S. W. 662, 131 Am. St. Rep. 97, 20 L. R. A. (N. S.) 1168); *Hutton* v. *Stewart,* 90 Kan. 602 (135 Pac. 681); *Seabury* v. *Fidelity Ins. etc. Co.,* 205 Pa. St. 234 (54 Atl. 898); *Lombard*

v. *Sills,* 170 Mo. App. 555 (157 S. W. 93); *Payne* v. *Ponder,* 139 Ga. 283 (77 S. E. 32); *Keinath & Co.* v. *Reed,* 18 N. M. 358 (137 Pac. 841); 9 C. J. 631, 652; 4 R. C. L. 305, 309–311. There are cases holding that where the contract is one for the exchange of lands and its noncompletion is due to the inability of the customer to transfer a merchantable title, the broker is not entitled to a commission, because, it is argued, the employer cannot enforce a specific performance of the contract and thus secure what it was agreed he should have: *Conner* v. *Riggins,* 21 Cal. App. 756 (132 Pac. 849). See *Griffith* v. *Bradford* (Tex. Civ. App.), 138 S. W. 1072. The writer takes the view that it is illogical to hold in the one case that the broker has completely performed his duty and is entitled to his commission when the employer and customer execute a valid and binding contract, on the theory that by making the contract the employer accepts the customer as a person ready, able and willing to purchase or exchange, and to hold in the other case that the right of the broker to a commission is defeated if it afterwards appears that the customer is unable to carry out his written agreement and convey a merchantable title. If the contract is valid and binding, the employer has his remedy in damages. The fact that the customer does not have a complete title may prevent specific performance, and yet the employer is not without a remedy; and it must be remembered that the right to damages resulted from the services rendered by the broker. However, we wish now to direct attention to the contract of employment entered into between the plaintiff and defendant, for if it appears from an examination of the language of that instrument that the parties intended to make the plaintiff's right to a commission depend upon a completion of the transaction which he was em-

ployed to negotiate, then it will be unnecessary to decide · whether the · contract between the customer and employer for the exchange of their lands must in truth and in fact be capable of specific performance before it can be said that the broker is entitled to a commission where his contract of employment merely states in general terms that he is to find a purchaser or is to sell or exchange the employer's land.

11. The parties differ radically in their construction of the language used by them in their contract. Referring to the writing signed by the defendant and in which it agrees to pay a commission to the plaintiff, it will be observed that the instrument contains the following language:

"In the event that you find a buyer ready and willing to consummate a deal for said price and terms or on such other terms and price as may be agreed to by me."

The defendant contends that the words "consummate a deal" refer to a completed transfer and that they do not refer to a contract for a sale or exchange; while the plaintiff insists that to make a binding contract for an exchange is to "consummate a deal" within the meaning of these words. There are many cases holding that a contract for a sale is "the consummation of a sale" within the meaning of a broker's contract which provides for the payment of a commission upon "the consummation of a sale": *Ormsby* v. *Graham,* 123 Iowa, 202, 214 (98 N. W. 724); *Micks* v. *Stevenson,* 23 Ind. App. 475 (51 N. E. 492); *Wolverton* v. *Tuttle,* 51 Or. 501, 508 (94 Pac. 961); *Shaniwald* v. *Cady,* 92 Cal. 83 (28 Pac. 101); *Clark* v. *Battaglia,* 47 Pa. Sup. Ct. 290; *Purcell* v. *Firth* (Cal.), 167 Pac. 379; *Turner* v. *Watkins,* 36 Cal. App. 503 (172 Pac. 620); *Rice* v. *Mayo,* 107

Mass. 550; *Sheperd-Teague Co.* v. *Hermann,* 12 Cal. App. 394 (107 Pac. 622). On the other hand, there are precedents fully supporting the position of the defendant and holding that "to consummate a deal" means to complete the transfer: *Goodwin* v. *Siemen,* 106 Minn. 368 (118 N. W. 1008); *Conner* v. *Riggins,* 21 Cal. App. 756 (132 Pac. 849). See, also, *Nutting & Co.* v. *Kennedy,* 16 Ga. App. 569 (85 S. E. 767); *Morse* v. *Conley,* 83 N. J. L. 416 (85 Atl. 196); *Flower* v. *Davidson,* 44 Minn. 46 (46 N. W. 308); *Gaut* v. *Dunlap* (Tex. Civ. App.), 188 S. W. 1020; *Ball* v. *Davenport,* 170 Iowa, 33, 40 (152 N. W. 72). The conclusions reached in other adjudications are not as helpful as might be wished; for, after all the words "consummate a deal" may have one meaning under one set of circumstances and a different meaning under other circumstances: *Flower* v. *Davidson,* 44 Minn. 46, 48 (46 N. W. 308).

According to the rule found in Section 718, L. O. L., "The terms of a writing are presumed to have been used in their primary and general acceptation." The word "deal" has been defined as "an arrangement to attain a desired result by a combination of interested parties": *Reynolds* v. *Pray,* 148 Iowa, 213, 215 (127 N. W. 50); *Ball* v. *Davenport,* 170 Iowa, 33, 40 (152 N. W. 72); *Gaut* v. *Dunlap* (Tex. Civ. App.), 188 S. W. 1020, 1021. According to Webster's International Dictionary, the word "deal" when used to express an "arrangement to attain a desired result" means "a secret arrangement, as in business or political bargains." The same dictionary defines the word "deal" as "an act of buying and selling; a bargain." The primary meaning of the term "consummate" is: "to bring to completion; to raise to the highest point or degree; to complete; finish."

A further examination of the language of the contract of employment will disclose that the defendant agreed to pay—

"In cash as a commission for your services the following sums, to wit: $750 cash of the price for which said property is sold or at which it is exchanged, which said commission I authorize you to retain out of the first money paid on the purchase price of said property as a deposit or otherwise."

If there had been a sale for cash payable in installments or otherwise, then the commission to be paid would be "$750 cash *of the price.*" In other words, the commission would be paid out of the price. In *Ormsby* v. *Graham,* 123 Iowa, 202, 215 (98 N. W. 724), the employer agreed to execute and deliver a deed, through the broker, "when the said land is sold," and to allow him the stipulated "commission, to be retained in full out of the cash payment," or, if the payment did not pass through the broker's hands, then the employer was to pay the commission directly, and it was there held:

"That a completed sale as a basis for recovery of commissions was contemplated by the parties is shown in the stipulation, which authorized the agent to retain his compensation from the first cash installment of the price for which the property might be sold."

As has already been said, the general rule is that a broker employed under a contract to sell or exchange lands is, in the absence of a stipulation to the contrary, entitled to his commission immediately upon the execution of a valid and binding contract between the employer and customer; but in the contract presented to us we find that the parties have in at least one instance provided "to the contrary," for if a contract of sale had been made with the price payable in installments or

otherwise instead of a contract for an exchange, the commission would be "$750 *of the price*" with authority given to the broker to retain the commission out of the first payment made on the price.    When the contract of employment is construed as a whole, and especially when it is read in the light of the stipulation which in effect postpones the payment of the commission to such time as enough of the price is paid to satisfy the commission in the event of a contract of sale, we think that "to consummate a deal" should be interpreted, in the contract presented here, to mean the completion and carrying out of the contract of exchange by an actual transfer of the properties. Neither party charges the other with bad faith and consequently it is not necessary to discuss any questions which might be raised if the defendant had been guilty of bad faith.

The judgment is therefore affirmed.    AFFIRMED.

BENSON, JOHNS and BENNETT, JJ., concur.