Argued September 7, affirmed November 22, 1961

# KILLAM *v.* TENNEY
## 366 P. 2d 739

*Denton G. Burdick,* Portland, argued the cause for appellant. On the brief were Hutchinson, Schwab & Burdick.

*Mark A. Hathaway,* Portland, argued the cause for respondent. On the brief were Hathaway & Arnold.

Before McALLISTER, Chief Justice, and ROSSMAN, WARNER, PERRY and LUSK, Justices.

LUSK, J.

This is an action to recover a real estate broker's commission. In a trial before the court without a jury the court entered a judgment for the plaintiff in the sum of $10,000 as an agreed commission and $1,750 attorneys' fee. Defendant appeals.

The plaintiff Graham Killam, dba Graham Killam Co., is a licensed real estate broker in the city of Portland, Oregon. The defendant G. U. Tenney, dba West Coast Pictures, was the owner of real property in Portland improved by a building in which the business referred to was conducted. On December 9, 1958, the defendant signed a listing agreement by which he gave the plaintiff

> "* * * the sole and exclusive right to sell, exchange, or lease the property hereinafter described, at the price and terms hereinafter specified, or at such lesser price and upon such terms as the Owner may hereafter accept for a period of one-hundred-eighty (180) sixty (60) days from the date hereof, and continuing thereafter as a non-exclusive right to sell, exchange or lease for a like period of time unless terminated by a ten day notice in writing."

Other material parts of the listing agreement are the following:

> "The owner agrees to accept the following prices:
> "1. $100,000.00 for the real property located at 4321 N. E. Cully Blvd. This property is also known as Lot Nine (9), Block One (1), COMMUNITY ACRES.
> "2. $62,000.00 for the machinery, furniture, fixtures, name and good will.
> "3. Inventory at cost or wholesale market, whichever, is lower, with the proper allowance for obsolescence and unsalable items, the amount

of the inventory to be determined at date of closing, but is estimated to be $100,000.00.

"The owner agrees to accept $70,000.00 down payment on entire transaction with the balance of the payments due in 180 monthly installments including interest at the rate of six (6) per cent per annum.

"In the alternative, the owner agrees to lease the real property for a period of ten years with a ten year option of renewal at the rate of $750.00 per month with escalator clause for increases in taxes and insurance. In the event of lease the sales price of the business assets will remain at $62,000.00 and the inventory at price indicated above. In the event of lease of real property, down payment to be $70,000.00 on entire transaction.

"For performing the above services for the seller, either for the sale or lease of the real property and for the sale of personal property and inventory, the owner agrees to pay Graham Killam Co. a fee of $20,000.00.

"* * * * *

"* * * Graham Killam Co. shall have the right to retain from any deposit or payment on the purchase price the above fee for services rendered, directly or indirectly, in negotiating a sale of said property. In the event a purchaser makes a deposit or part payment on the price of said property and thereafter forfeits the same, or any part thereof, Graham Killam Co. shall be entitled to receive from said amount a sum equal to the extent of their fee as fully as if the said sale or exchange had been fully consummated.

"In the event said property is sold, leased or exchanged during the period of this contract, or Graham Killam Co. procures a purchaser ready, able and willing to purchase at the terms above specified, or places the Owner in touch with a purchaser to whom at any time subsequent to the termination of this contract the Owner sells or conveys the said property, or if the Owner during the period

of this contract withdraws the authority hereby given, the Owner shall pay to Graham Killam Co. the same fee as hereinabove specified, and in any such event, the amount of said fee shall be a lien upon said property. In case of suit or action on this contract, Owner agrees to pay in addition to the above specified fee such sum as the Court may adjudge reasonable as attorney's fees. * * *"

A salesman employed by the plaintiff introduced Mr. Carter Stanley as a prospective purchaser to the defendant and as a result of direct negotiations between the defendant and Stanley, the defendant gave to the latter on January 13, 1959, the following option agreement:

"Portland, Oregon
January 13 1959

## "OPTION AGREEMENT

"For $10.00 (ten dollars) in hand received and other good and valuable consideration, G. U. Tenney, dba West Coast Pictures, 4321 N. E. Cully Blvd., hereby gives to Carter Stanley and associates, with right of assignment to a corporation to be formed, this option, to exprie [sic] March 15, 1959, as follows:

"Option to purchase the machinery, equipment and name of said business for the sum of $50,000.00, and the inventory of said business as of the date this option is exercised, at 75% (seventy-five per cent) of cost or market value thereof whichever is lower. The right to fully verify the inventory and to examine the company's books is extended.

"Mr. Tenney agrees to lease the existing premises to Carter Stanley and associated [sic] at the monthly rental of $700.00 (seven hundred dollars) for a period of ten years with an option to renew for a period of ten years. Mr. Tenney further agrees that said lease shall contain an option, good for the term of the lease, to purchase the building

and land for the sum of $100,000.00 (one hundrend [sic] thousand dollars), 75% (seventy five per cent) of the $700.00 (seven hundred dollar) per month rent paid prior to the exercise of this purchase option, to apply as down payment. As a further consideration of rent, the lesee [sic] agrees to pay all property taxes and to keep the building adequately insured.

"Down payment is not to exceed 29% of total of inventory and equipment values as above set forth, and balance to be paid in equal payments of 10% each year with ten annual interest payments of $875.00 (eight hundred seventy-five dollars) per year.

"G. U. Tenney
"Garnet R. Tenney

"Witness: Roy E. Thomas

"This option is given with the consideration tha[t] the real estate borker [sic] representing Mr. Tenney will accept a sales commission of not more than $10,000.00 (ten thousand dollars)."

Garnet R. Tenney is the wife of the defendant G. U. Tenney.

On February 16, 1959, Mr. Stanley informed the defendant and his wife orally that he was exercising the option. Getting "no reaction" from the defendant, Mr. Stanley had his attorney, Mr. Donald J. Griswold, write the following letter addressed to the defendant and his wife under date of February 25, 1959:

"February 25, 1959

"Mr. and Mrs. G. U. Tenney
4321 N. E. Cully Blvd.
Portland, Oregon

"Dear Mr. and Mrs. Tenney:

"The purpose of this letter is to repeat and confirm the verbal exercise of the option dated January 13, 1959 of Carter Stanley, which verbal exercise was made on February 16, 1959.

"As you know this option includes the right to purchase the machinery, equipment and name of said business (which name is West Coast Pictures) for $50,000.00, and the inventory of said business as of the date this option is exercised, at 75% of cost or market whichever is lower. Mr. Stanley also exercises the right to lease your existing premises in accordance with the option agreement.

"If possible we would like to make arrangements to close this purchase prior to March 1, 1959, and to this end will look forward to hearing from you immediately in regard to the inventory valuation and other matters which must be resolved. You are also requested to name the escrow agent for purposes of the down payment, transfer of title, etc.

"Very truly yours,
"DONALD J. GRISWOLD
"Donald J. Griswold

"djg:w
"cc: Mr. Wilmot K. Royal, Attorney
 Failing Building
 Portland, Oregon

 "Mr. Graham Killam
 4400 N. E. Hancock
 Portland, Oregon"

Following the mailing of the foregoing letter, a meeting was had between Mr. Griswold, his partner Mr. David D. Pattullo, and Mr. Royal, who was then attorney for the defendant. Thereafter, on March 5, 1959, Mr. Griswold wrote Mr. Royal the following letter:

"March 5, 1959

"Mr. Wilmot K. Royal, Attorney
Failing Building
Portland, Oregon

"Re: Tenney-Stanley Sale

"Dear Mr. Royal:

"Reference is made to the conference held in

my office between yourself, Mr. Pattullo and this writer in regard to concluding the arrangements for the transfer of the business and assets of Mr. Tenney to Mr. Stanley pursuant to the option agreement entered into on January 13, 1959.

"In order to expedite this matter and in order to avoid question as to which party was to proceed, it was decided that I would write you a letter setting forth our conclusions. If you disagree with any of my statements, please get in touch with me immediately so that we may iron out any differences.

"You pointed out the fact that your client was in Grants Pass and you did not know when he would return and be available for consideration of the necessary matters. It will, of course, be necessary that Mr. Tenney himself or an agent appointed by him be available in order to resolve the inventory valuation and other matters which must be done. We urge that you impress upon Mr. Tenney, Mr. Stanley's desire to consummate this action as soon as possible. If Mr. Tenney is not physically able, perhaps there is someone else who has the know-how and whom he would trust to act as his agent.

"Below is a list of the items to be decided upon and, in some cases, an indication of our understanding of the disposition of these items:

"1. The first thing that should be done before we proceed further is to determine whether or not the broker, Mr. Graham Killam, will accept the $10,000.00 sale's commission set forth as a foot note to the 'option agreement'. It appears to us that it is up to you to discuss and resolve this matter with Mr. Killam in view of the fact that the sale's commission and the contract between Mr. Killam and your client are only incidental matters insofar as Mr. Stanley is concerned.

"2. It will be necessary to value the inventory for the purpose of determining the price to be

paid for the business. It is my understanding that the original intention was to adjust the December 31, 1958, inventory for purchases and sales, but in view of the lapse of time this may no longer be feasible and it may be necessary to completely revalue the inventory. This is one of the items which will evidently be necessary for either Mr. Tenney or an agent to be present to resolve. Insofar as we know, Mr. Stanley will make himself available at any reasonable time to accomplish this valuation.

"3. *Downpayment.* According to our understanding of the downpayment to be made and in accordance with the notes labeled 'details of purchase plan' we understand that $25,000.00 is to be paid in cash and the difference between this figure and 29% is to be paid by the assumption by Mr. Stanley or a corporation of the balance of the downpayment (aggregating 29% of the purchase price) in trade payables.

"4. *Fire hazard problem.* The fire marshall [sic] has informed Mr. Tenney that certain changes must be accomplished to make the premises being leased safe. It is our understanding that Mr. Tenney has agreed to make the necessary changes in order to comply with the demands of the fire marshall [sic].

"5. *Additional contiguous property.* In accordance with our conversation there is a vacant lot immediately adjoining the plant which was purchased by Mr. Tenney separate from the factory itself. We understand that Mr. Stanley and Mr. Tenney have agreed that this contiguous property, which is all now owned by Mr. Tenney, is to be a part of the transaction and will be leased by Mr. Tenney as a part of the lease-option agreement. This property will also be included in the option price of $100,000.00.

"6. *Allocation of purchase price.* It would be desirable to allocate the $100,000.00 option price between the land and the buildings or building

in order to avoid future conflict with the taxing authorities on this point.

"7. We ask that Mr. Tenney establish the following for the purpose of consummating this sale:

"(a) Appoint an escrow agent for the purpose of depositing with such escrow agent the documents and funds necessary for a completion of this deal.

"(b) Also appoint and deliver to an escrow agent the deed to the land and buildings in order that there will be no problem of obtaining title if and when the option is exercised by Mr. Stanley.

"(c) Designate the person to whom and the address for the purpose of making the monthly rental payments and the annual principal and interest payments.

"In addition to the above it will be necessary to comply with the provisions of ORS 79.010 etc. This, as you know, is the bulk sales act and it will be necessary for Mr. Tenney to deliver to us a list of his creditors in order that we may comply with this act. For the details, reference is made to the applicable ORS Sections.

"If we have omitted or misconstrued any portions of our conversation, we ask that you promptly correct us.

"Your cooperation is appreciated.

"Very truly yours,
"DONALD J. GRISWOLD
"Donald J. Griswold
"djg:w
"cc: Mr. Carter Stanley"

On March 11, 1959, the plaintiff wrote a letter to Mr. Royal in which he stated his "acceptance of the $10,000.00 Sales Commission referred to by Mr. and Mrs. Tenney, in that certain option agreement dated

January 13, 1959, granting to Carter Stanley and Associates the right to purchase the West Coast Pictures." A copy of this letter was sent to Mr. Griswold. On March 12, 1959, Mr. Stanley wrote the following letter on the stationery of his attorney to Mr. Royal:

"March 12, 1959

"Mr. Wilmot K. Royal
Attorney for G. U. Tenney
    and Garnet R. Tenney
Failing Building
Portland, Oregon

"Re: Tenney-Stanley Sale

"Dear Mr. Royal.:

"I understand that Mr. Graham Killam has agreed to accept the $10,000.00 broker's commission, which was attached as a 'consideration' to the option dated January 13, 1959, which I, Carter Stanley, hold. In view of this fact, it now appears that all legal obstacles are removed insofar as I am concerned in exercising this option. Consistent with my letter dated February 25, 1959, from my attorney, in which letter I confirmed the verbal exercise of the option and consistent with the further letter of March 5, 1959, also from my attorney and setting forth the various steps to be taken in consummating this sale, I now offer to you as attorney for Mr. and Mrs. Tenney in this matter $25,000.00, this amount being the cash downpayment that was to be paid by me in this transaction.

"Pursuant to the option, the downpayment was not to exceed 29% of the total inventory and equipment values and I do further offer pursuant to the agreement between Mr. Tenney and myself to assume trade liabilities in an amount sufficient to make up the difference between the $25,000.00 cash payment agreed upon and the percentage figure set forth in the option.

"We have previously asked you to name an escrow agent and furnish us with the names of

Mr. Tenney's creditors pursuant to the Oregon Bulk Sale Act in order that our payment might be made into escrow and in order that we might comply with the Bulk Sales Law. Since neither of these things have been done, I condition my offer upon furnishing me with a list of Mr. Tenney's creditors in order that I may comply with the Bulk Sales Act.

"I further offer to sign all documents, agreements and instruments that are necessary to carry out this transaction and to transfer the title and possession in this business and its assets from Mr. and Mrs. Tenney to myself. Further, I offer to enter into the lease agreement and to sign with Mr. Tenney the non-competition agreement, all pursuant to the option and our agreement.

"I am fully prepared and will upon acceptance and delivery, on your part, turn over the $25,000.00 and do all other and necessary acts legally required in order to complete this transaction.

> "Very truly yours,
> "CARTER STANLEY
> "Carter Stanley

"On behalf of my clients, Mr. and Mrs. Tenney, I, ___reject___ the offer made by Mr. Carter Stanley on this 12th day of March, 1959.

> "_____
> Wilmot K. Royal, Attorney            "

The foregoing letter was delivered personally by Stanley and Griswold to Royal, and the latter wrote on it "rejected" without giving any reason therefor. On March 16, 1959, Mr. Royal wrote to Messrs. Stanley and Griswold "that the counter offers contained in your respective letters of February 25th, 1959, March 5th, 1959 and March 12th, 1959, in the above matter are hereby not accepted by G. U. Tenney and Garnet R. Tenney." This brought a response from

Mr. Griswold to the effect that no counteroffers had been made, but that the previous letters of February 25, March 5 and March 12 were "all attempts to secure performance by G. U. Tenney and Garnet R. Tenney pursuant to the Option Agreement which they signed."

Under the terms of the listing agreement, the defendant promised to pay the plaintiff a fee of $20,000 "[i]n the event said property is sold, leased, or exchanged during the period of this contract." If Tenney entered into a valid and binding contract with Stanley for the sale of the machinery, furniture, fixtures, name, and good will, and the inventory of West Coast Pictures and the lease of the premises, this stipulation was fulfilled and Tenney became liable for payment of the broker's fee, reduced later to $10,000 by agreement of the plaintiff. *Scott v. Merrill's Estate,* 74 Or 568, 572, 146 P 99; *Stewart v. Will,* 65 Or 138, 140, 131 P 1027; *Columbia R. I. Co. v. Alameda L. Co.,* 87 Or 277, 286, 168 P 64, 440; *Oregon H. Builders v. Montgomery Inv. Co.,* 94 Or 349, 363-364, 184 P 487.

■ The rule approved by these authorities, as it is stated in 8 Am Jur 1094, Brokers, § 179, is that "unless the broker and his employer have expressly stipulated to the contrary, the broker is entitled to his compensation upon the completion of the negotiations which he undertook, irrespective of whether or not the contract negotiated is ever actually consummated or whether the failure to complete the contract is due to the default or refusal of the employer or to that of the party procured by the broker, so long as the failure to carry it through to a successful completion is not due to any fault of the broker or so long as he has not been guilty of fraud or bad faith." The defendant contends that the listing agreement in this case

does contain a stipulation "to the contrary", in that it provides:

> "Graham Killam Co. shall have the right to retain from any deposit or payment on the purchase price the above fee for services rendered, directly or indirectly, in negotiating a sale of said property."

Support for this position is claimed to be found in *Oregon H. Builders v. Montgomery Inv. Co.*, supra. That case involved an exchange of properties, together with a cash payment to be made by one of the parties to the agreement. The broker's contract of employment contained a promise of the employer to pay a commission

> "In the event that you find a buyer ready and willing *to consummate a deal* for said price and terms or on such other terms and price as may be agreed to by me * * *." (Italics added.)

It was further provided that the defendant agreed to pay

> "in cash, as a commission for your services, the following sums, to-wit: $750.00 cash of the price for which said property is sold or at which it is exchanged, which said commission I authorize you to retain out of the first money paid on the purchase price of said property as a deposit, or otherwise."

In an action brought by the broker to recover his commission from his employer, the defendant contended that the words "consummate a deal" referred to a completed transfer and not to a contract for sale or exchange and that unless a transfer was completed no liability for the payment of a fee would arise. Construing together the two provisions which we have quoted, the court held that the words "$750.00 cash of the price" indicated that "the commission would be

paid out of the price" and that the words "to consummate a deal" meant, in the case of an exchange of properties, a completed transfer. The court said:

"As has already been said, the general rule is that a broker employed under a contract to sell or exchange lands is, in the absence of a stipulation to the contrary, entitled to his commission immediately upon the execution of a valid and binding contract between the employer and customer; but in the contract presented to us we find that the parties have in at least one instance provided 'to the contrary,' for if a contract of sale had been made with the price payable in installments or otherwise instead of a contract for an exchange, the commission would be '$750 *of the price*' with authority given to the broker to retain the commission out of the first payment made on the price. When the contract of employment is construed as a whole, and especially when it is read in the light of the stipulation which in effect postpones the payment of the commission to such time as enough of the price is paid to satisfy the commission in the event of a contract of sale, we think that 'to consummate a deal' should be interpreted, in the contract presented here, to mean the completion and carrying out of the contract of exchange by an actual transfer of the properties. * * *" 94 Or at 368-369.

In the instant case the contract of employment provides:

"For performing the above services for the seller, either for the sale or lease of the real property and for the sale of personal property and inventory, the owner agrees to pay Graham Killam Co. a fee of $20,000.00."

Here is an absolute promise to pay the stipulated fee "for performing the above services" without any limitation whatever. The provision upon which the defendant relies is found further along in the contract and

is separated from that just quoted by several other provisions on unrelated subjects. It is followed immediately by this language:

"In the event a purchaser makes a deposit or part payment on the price of said property and thereafter forfeits the same, or any part thereof, Graham Killam Co. shall be entitled to receive from said amount a sum equal to the extent of their fee as fully as if the said sale or exchange had been fully consummated."

Thus, there are significant differences between the agreement in this case and that in *Oregon H. Builders v. Montgomery Inv. Co.* The agreement here is not one to pay a fee out of moneys paid or deposited on the purchase price, but to pay $20,000 for the services rendered regardless of the source of the money. The provision on which the defendant depends, instead of being a limitation on this promise, is a reservation of the right to be paid out of a deposit or payment on the purchase price, which is additional to the promise first expressed and not a limitation of it. Finally, the sentence last above quoted negatives the notion that no fee would be payable unless a "deal" should be "consummated" by expressly providing that, if there should be a deposit or part payment of the purchase price, the broker would be entitled to payment from such deposit or part payment up to the amount of his fee "as fully as if the said sale or exchange had been fully consummated."

■ *Oregon H. Builders v. Montgomery Inv. Co.* is not in point and the general rule that the broker earns his fee when an enforceable contract of sale has been executed applies to this case.

■ The option contract was based upon a consid-

eration and was "both an offer and also a unilateral contract." 5 Williston, Contracts (rev ed) 4025, § 1441. Upon the seasonable unqualified acceptance of the offer there would emerge a valid bilateral contract which the courts will specifically enforce. *Herndon v. Armstrong,* 148 Or 602, 608, 36 P2d 184, 38 P2d 44; *Strong et al. v. Moore et al.,* 105 Or 12, 21, 207 P 179, 23 ALR 1217; *Sprague v. Schotte,* 48 Or 609, 611, 87 P 1046; *House v. Jackson,* 24 Or 89, 95, 32 P 1027; *Northern Illinois Coal Corp. v. Cryder,* 361 Ill 274, 197 NE 750, 101 ALR 1420, Annotation 1432; James, Option Contracts, 320, § 814; Williston, id. As stated in James, id., it may be said that an option "is an agreement giving the optionee the right to turn the option agreement into a contract to convey upon the performance by him of an act called election. In short, an option is a conditional agreement to convey."

■■ The manner in which election shall be exercised, whether by notice or tender of the purchase price, and execution of the lease, is not stated in the instrument and is to be discovered from its language. *Breen v. Mayne,* 140 Iowa 399, 118 NW 441; *Snead v. Wood,* 24 Ga App 210, 100 SE 714. Where there is nothing in the option limiting the way in which notice of its exercise is to be conveyed, anything that amounts to a manifestation of the optionee's determination to accept is sufficient. *Gordon v. Curtis Bros. et al.,* 119 Or 55, 62-63, 248 P 158; 55 Am Jur 507, Vendor and Purchaser, § 38. Here, not only was there no stipulation as to the manner of exercise of the option, but, since the amount of the purchase price and of the down payment was not definitely fixed and could be ascertained only after the inventory should have been valued, "as of the date this option is exercised," it was not necessary for Stanley to tender anything in

order to exercise the option, but notice to Tenney of his decision to do so was sufficient.

The case is like *Northern Illinois Coal Corp. v. Cryder,* supra. There the option agreement for the sale of a farm contained a provision that the optionee should assume a mortgage on the property in the sum of $21,000, but that if, at the time of exercising the option, any part of the encumbrance had been paid off, the optionee would pay to the optionors the difference between $21,000 and the then existing encumbrance. The optionee gave notice of exercise of the option within the time provided in the instrument and afterwards brought suit for specific performance of the contract. The defendant contended, among other things, that the plaintiff was required not only to exercise the option by notice within the time fixed by its terms, but also within the same time to tender the purchase price. The court pointed out the distinction, not always observed, between "the provisions pertinent to the exercise of the option, by which acceptance [of] it has been converted into an executory contract, and those relating to its performance." Among the latter, it was said, was the duty of the optionors "to furnish the optionee with information as to the amount, if any, by which the mortgage debt had been reduced, in order that the optionee might know the amount to be paid to the optionors to conclude the purchase of the premises." It was held that giving of the notice was all that was required and the court concluded the discussion of the question by saying:

"The tender of the purchase price was not made a condition precedent by the option contract. Time was the essence of the option but was not of the essence of the performance of the contract. The delivery of the deed and the payment of the purchase price were dependent covenants which were

to be fulfilled concurrently (citing authorities). It follows that the contract was to be performed within a reasonable time after its acceptance." 361 Ill at 285, 286.

This is precisely the posture of the instant case. The intention of the parties as disclosed by their agreement was that the amount of the purchase price and, therefore, of the down payment should be ascertained after the giving of notice by Stanley and that thereafter payment of the down payment and delivery of the necessary instrument transferring title to the machinery, etc., and execution of the lease were all to be done concurrently and in performance of the contract. The distinction to be observed is between provisions in the option contract which make tender of the price one of the acts necessary to constitute an election and those in which such tender is performance of the contract arising from the act of acceptance. James, Option Contracts, 369, § 844. Similar decisions to *Northern Illinois Coal Corp. v. Cryder,* supra, are *Wachovia Bank & Trust Co. v. United States,* 98 F2d 609 (4th Cir. 1938); *Moore v. Kirgan* (1952, Tex Civ App) 250 SW2d 759; *Abrahamson v. Wilson,* 131 Colo 580, 284 P2d 662; *Turner v. McCormick,* 56 W Va 161, 49 SE 28, 107 Am St Rep 904, 67 LRA 853. See, also, James, Option Contracts, 369, § 844; *Snead v. Wood,* supra.

Oregon cases relied on by defendant do not support his position. Among these is *Leadbetter v. Price,* 103 Or 222, 202 P 104. The case involved an alleged oral option for the repurchase of stock. As testified to by the plaintiff, the defendant said to him: "All right; you pay me back what I paid you and 6 per cent interest and you can have it." This court denied relief to the plaintiff on the ground, among others,

that the option could only be exercised by payment of the price. The court said:

> "The particular act or acts which constitute an election may be fixed by the terms of the option, such as payment of the price, in which case payment of the price is made a condition precedent to the exercise of the right to buy, and the money must be paid or tendered, and a mere notice of intention to buy, or that the optionee will take the property does not change the relation of the parties and does not raise a binding promise upon the part of the optionor." 103 Or at 235.

The other cases cited by the defendant need not be specifically discussed for they all involve agreements similar to that construed in *Leadbetter v. Price* and are distinguishable for the reasons hereinabove given from the agreement with which we are now dealing. See *Aspinwall, Executrix, v. Ryan et al.*, 190 Or 530, 538, 226 P2d 814; *Albachten v. Miller et ux.*, 216 Or 379, 383, 339 P2d 427, 72 ALR2d 1122. We hold that in this case exercise of the option by notice was sufficient.

■■ As stated, the acceptance of the offer must be unqualified and unconditional. The defendant contends that it was conditional. The answer to that contention is to be found in the language of the letter written by Mr. Griswold, on behalf of Mr. Stanley, to Mr. and Mrs. Tenney under date of February 25, 1959. The letter opens with the statement that its purpose is "to repeat and confirm" the verbal exercise of the option "made on February 16, 1959." It next refers briefly to the terms of the option, that is, the purchase of the machinery etc. of West Coast Pictures and the purchase price, and states "Mr. Stanley also exercises the right to lease your existing premises in accordance with the option agreement." So far, we think it is not

even arguable that the letter does not constitute an unqualified and unconditional exercise of the option.

The contention of the defendant is based upon the concluding paragraph of the letter which we again quote:

> "If possible we would like to make arrangements to close this purchase prior to March 1, 1959, and to this end will look forward to hearing from you immediately in regard to the inventory valuation and other matters which must be resolved. You are also requested to name the escrow agent for purposes of the down payment, transfer of title, etc."

It is not suggested that the expression of a desire to close the purchase before March 1, 1959, and to hear from the Tenneys immediately in regard to the inventory valuation or the request to name an escrow agent are in any way effective to dilute the exercise of the option. The whole reliance is upon the use of the words "and other matters which must be resolved", which are said to qualify the acceptance and make it contingent upon the decision of other unspecified and unknown questions. And the nature of these "other matters", it is argued, is disclosed in the subsequent letters written by Stanley's attorneys which contain what are claimed to be counteroffers.

With this interpretation we are unable to agree. It would be unreasonable to say that anything in the concluding paragraph of the letter of February twenty-fifth was intended to qualify the exercise of the option so clearly expressed in the first part of the letter or could have been reasonably so understood by Tenney, and it is significant that nothing in the record discloses that either Tenney or anyone acting on his behalf ever gave this or any other reason to Stan-

ley for refusing to go through with the transaction until Mr. Royal's letter of March 16, 1959, in which he referred to the "counter offers" in the previous letters of Mr. Griswold and Mr. Stanley.

The concluding paragraph of the letter of February twenty-fifth relates entirely to the performance of what had now become a binding contract—the valuation of the inventory, the appointment of an escrow agent, and other matters of a similar nature which would have to be decided upon or "resolved", as the letter expresses it, to the end that the transaction might be completed in an orderly fashion. So far from language making the acceptance conditional on a change in the terms of the contract, there is not even a suggestion of such a change. The words "other matters which must be resolved" can be justly interpreted only in the context of the paragraph in which they are found and that paragraph deals exclusively with proposals for carrying out the contract, not for changing it or adding new terms. Beyond that, there is no language making the acceptance of the offer contingent upon anything. It was not even a "grumbling" acceptance. 1 Corbin, Contracts (1950 ed) 266-267, § 84. And even though the letter had contained a request for a change or addition to the terms of the offer, this would not have been sufficient to alter its unconditional character, unless the acceptance was made to depend on an assent to the change or added terms. 1 Restatement, Contracts § 62; 1 Williston, Contracts (3d ed) 261-262, § 79; 1 Corbin, Contracts (1950 ed) 266-267, § 84; *Turner v. McCormick,* supra; *Snead v. Wood,* supra.

■ It is argued, however, that the subsequent proposals in Mr. Griswold's letter to Mr. Royal under

date of March 5, 1959, had the effect of conditioning the acceptance. This letter listed six items "to be decided upon and, in some cases, an indication of our understanding of the disposition of these items." Some of the items as, for example, the suggestion that it was necessary to obtain Mr. Graham Killam's consent to reduction of his sales commission (which was a condition stated in the option) and the desirability of allocating the option price between the land and building for tax purposes are clearly not subject to the defendant's objection. Others might fairly be construed as merely a statement of the attorney's understanding of terms agreed upon by the parties in addition to those not expressed in the option contract. As to the item relating to the vacant lot adjoining the plant, it is possible that, due to the ambiguity in the reference in the option contract to the land to be leased, the contract might be construed, with the aid of parol evidence, to include the vacant lot. Such evidence was offered on the trial, but excluded on objection. But whether the ruling was correct or not, the conclusiveness of Stanley's previous acceptance of the offer would not be in any way affected by his contention about the vacant lot, for the reason that when he gave notice of his election he accepted the terms of the offer in the option contract with whatever construction might be placed upon them by a court in case of subsequent litigation. There are no words of ultimatum in the letter, and it is arguable that it was not written with the intention of qualifying the acceptance in any manner. We do not pass upon any of these questions, but will assume, arguendo, that the defendant's view of the purpose and meaning of the letter is the correct one. Even so, the defendant is not aided.

As stated in 1 Corbin, Contracts (1950 ed) 268, § 85:

> "An exact and unconditional acceptance of an offer is not afterwards turned into a conditional acceptance so as to invalidate the contract by an improper interpretation of the terms of this contract by one of the parties or by his attempt to alter the terms of the contract in some respect."

To the text is cited *Frederick Raff Co. v. Murphy,* 110 Conn 234, 147 A 709. In this case the plaintiff, desiring to obtain the contract for installation of the heating in a building to be erected, was required to include as a part of his bid, a bid for the plumbing work. The plaintiff invited a bid for the plumbing from the defendants, who submitted a bid which the plaintiff accepted. The plaintiff submitted the combined bids to the owner and was awarded the contract. The next day plaintiff advised the defendants of the fact and mailed them an order to install the plumbing for a sum less than the amount of the defendants' bid. The difference represented a deduction of the defendants' proportionate share of the bond required to be filed by the plaintiff. The defendants refused to go forward with the work. The plaintiff employed another contractor to do the plumbing and brought action against the defendants to recover as damages the difference between the amount of the defendants' bid and the amount that the plaintiff was required to pay to the other contractor. The court, speaking through Mr. Justice Maltbie, after holding that the plaintiff had accepted the defendants' offer and communicated that acceptance so as to constitute a binding contract, said:

> "Nor did the fact that the plaintiff, in sending them the order to proceed with the work made a deduction from the amount of their bid, represent-

ing a portion of the cost of the bond it had to file, affect the rights of the parties. The contract relationship had already been created and if the plaintiff had no right to make this deduction, as upon this record we must assume it did not, the effect would be merely that it attempted an alteration in the terms of the contract ineffective because not assented to by the defendants, and the defendants could have proceeded with the work and claimed the full price agreed upon. Barlow Brothers v. Lunny, 102 Conn. 152, 128 Atl. 115; C. and C. Electric Motor Co. v. D. Frisbie & Co., 66 Conn. 67, 94, 33 Atl. 604." 110 Conn at 240, 147 A at 711.

Another illustration of the application of this rule is to be found in *McCormick v. Stephany*, 61 NJ Eq 208, 48 A 25. A lease contained a provision granting to the lessee the right to purchase the property in the event that the lessor should find a purchaser. In other words, the lease gave the lessee a "preferential right" to purchase. The lessee, learning that the lessor had found a purchaser, gave the lessor notice of exercise of the option to purchase the property at the stipulated price and that the same would be paid on tender of a deed "with full covenants." There was no such requirement in the option. The lessor refused to convey. Later the lessee tendered the purchase price and demanded a deed "with full covenants free of all encumbrances." This demand also met with a refusal and the lessee brought suit for specific performance. The lessor contended that the lessee's demand was in effect a new offer and a rejection of the right to purchase granted in the lease. The decree went for the lessee, requiring merely that the lessor execute "a good and sufficient deed" for the premises upon payment of the purchase price and not requiring full covenants. The court said that the agreement was "a completed purchase of a right to have a conveyance

if the purchaser shall choose to buy, upon the terms named" and that the "overdemand" did not release the lessor from his obligation. Like *Frederick Raff Co. v. Murphy,* supra, the case stands for the proposition that after an offer has been accepted in accordance with its terms, subsequent demands for additional or different terms not assented to by the other party will not be given effect as a rejection of the offer nor will they change the rights and obligations of the parties.

It is our conclusion that the evidence shows that the defendant entered into a valid binding contract for the sale and lease to Stanley of the property described in the contract of employment between the plaintiff and the defendant and that the plaintiff is entitled to recover the amount of the stipulated commission.

The judgment is, therefore, affirmed.